**728**

UNITED STEELWORKERS OF
AMERICA, AFL–CIO–CLC,
Petitioner,

v.

Thorne G. AUCHTER, Assistant Secretary of Labor, Occupational Safety and Health Administration, United States Department of Labor, Respondent,

and

The State of New York, the State of New Jersey, the State of Connecticut, and National Paint & Coatings Association, Intervenors.

UNITED STEELWORKERS OF
AMERICA, AFL–CIO–CLC,
Petitioner,

v.

Thorne G. AUCHTER, Assistant Secretary of Labor, Occupational Safety and Health Administration, United States Department of Labor, Respondent,

and

The State of New Jersey, Chemical Manufacturers Association, American Petroleum Institute & Atlantic Richfield Company, and National Paint & Coatings Association, Intervenors.

PUBLIC CITIZEN, INC., et
al., Petitioners,

v.

Thorne G. AUCHTER, Assistant Secretary of Labor, Occupational Safety and Health Administration, United States Department of Labor, Respondent,

and

The State of New Jersey, Chemical Manufacturers Association, National Paint & Coatings Association, American Petroleum Institute & Atlantic Richfield Company, Intervenors.

COMMONWEALTH OF
MASSACHUSETTS,
Petitioner,

v.

OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION,

Secretary of Labor, United States Department of Labor, Respondent.

PEOPLE of the State of
ILLINOIS, Petitioner,

v.

UNITED STATES DEPARTMENT OF LABOR and John Donovan, Secretary of the United States Department of Labor, Respondents.

The STATE OF NEW YORK,
Petitioner,

v.

Thorne G. AUCHTER, Assistant Secretary of Labor, Occupational Safety and Health Administration, United States Department of Labor, Respondent.

Nos. 83–3554, 83–3561, 83–3565, 84–3066, 84–3093 and 84–3128.

United States Court of Appeals,
Third Circuit.

Argued March 18, 1985.

Decided May 24, 1985.

George H. Cohen, Robert M. Weinberg, Jeremiah A. Collins, Gary L. Sasso, Bredhoff & Kaiser, Washington, D.C., James D. English, Mary-Win O'Brien, United Steelworkers of America, Pittsburgh, Pa., Laurence Gold (argued), Washington, D.C., Joseph Lurie, Galfand, Berger, Senesky, Lurie & March, Philadelphia, Pa., for United Steelworkers of America, AFL–CIO–CLC.

Francis X. Lilly, Solicitor of Labor Frank A. White (argued), Associate Solicitor for Occupational Safety and Health, Karen I. Ward, Associate Solicitor for Sp. Appellate and Supreme Court Litigation, Mary-Helen Mautner, Counsel for Appellate Litigation, Judith A. Macaluso, Asst. Counsel for Appellate Litigation, U.S. Dept. of Labor, Washington, D.C., Dennis K. Kade, Nathaniel Spiller, (argued), Domenique Kirchner, U.S. Dept. of Labor, Washington, D.C., for respondent, Thorne G. Auchter, Asst. Secretary of Labor, OSHA, U.S. Dept. of Labor.

Robert Abrams, Atty. Gen. of the State of N.Y., Carlin Meyer, Asst. Atty. Gen., In Charge of Labor Bur., James A. Sevnsky, Asst. Atty. Gen. In Charge of Environmental Protection Bur., Nancy Stearns (argued), Jane Lauer Barker, Asst. Attys. Gen., New York State Dept. of Law, New York City, for the State of N.Y.

Irwin I. Kimmelman, Atty. Gen. of N.J., Michael R. Cole, First Asst. Atty. Gen., Michael S. Bokar, Deputy Atty. Gen., Richard J. Hughes Justice Complex, Trenton, N.J., for the State of N.J.

Joseph I. Lieberman, Atty. Gen., Richard T. Couture, Asst. Atty. Gen., Hartford, Conn., for the State of Conn.

Timothy J. Waters, Jeanne A. Carpenter, Jeffrey N. Martin, Peabody, Lambert & Meyers, A Professional Corp., Washington, D.C., Bruce Hamill, Gen. Counsel, James Andrew Doyle, National Paint and Coatings Ass'n, Washington, D.C., for Nat. Paint and Coatings Ass'n, Inc.

Richard E. Schwartz, Collier, Shannon, Rill & Scott, Washington, D.C., for the American Iron and Steel Institute as amicus curiae.

Stark Ritchie, Arnold S. Block, Christopher H. Marraro, American Petroleum Institute, Washington, D.C., John P. Meck, Atlantic Richfield Co., Los Angeles, Cal., for American Petroleum Institute, et al.

David C. Vladeck (argued), Alan B. Morrison, Public Citizen Litigation Group, Washington, D.C., for Public Citizen.

Neil F. Hartigan, Atty. Gen., State of Ill., Lee Hettinger, Chief, Stephen Grossmark, Asst. Atty. Gen., Environmental Control Div., Chicago, Ill., for the People of the State of Ill.

Francis X. Bellotti, Atty. Gen., Judith S. Yogman, Asst. Atty. Gen., Stephen S. Ostrach (argued), Asst. Atty. Gen., Government Bureau, Boston, Mass., for petitioner Com. of Mass.

Daniel Marcus (argued), Charles E. Davidow, Wilmer, Cutler & Pickering, Washington, D.C., David F. Zoll, Claire M. Boccella, Chemical Manufacturers Ass'n, Washington, D.C., for Chemical Manufacturers Ass'n.

Beverly Gross, Linda M. Nelson, New York City, for amicus curiae Municipal Labor Committee.

Paul Bardacke, Atty. Gen., Douglas Meiklejohn, Asst. Atty. Gen., Christopher

D. Coppin, Asst. Atty. Gen., Santa Fe, N.M., for amicus curiae State of N.M. and the New Mexico Health and Environment Dept.

Peter A. Joy, Cleveland, Ohio, Clifford S. Mitchell, American Medical Student Ass'n, Reston, Va., Peter S. Levine, Nat. Lawyers Guild, Shaker Heights, Ohio, for amicus curiae American Medical Student Ass'n.

Frederick J. Jacobs, New York City, for N.Y. Committee for Occupational Safety and Health.

Bronson C. LaFollette, Atty. Gen., Nadim Sahar, Asst. Atty. Gen., Wis. Dept. of Justice, Madison, Wis., for amicus curiae State of Wis.

Chauncey H. Browning, Atty. Gen., Leonard Knee, Deputy Atty. Gen., Edward Z. Fox, Asst. Atty. Gen., Charleston, W.V., for amicus curiae for the State of W.V.

Before GIBBONS, Circuit Judge, and FISHER, Chief Judge * and KELLY, District Judge **

**OPINION OF THE COURT**

GIBBONS, Circuit Judge:

This case involves consolidated petitions for judicial review of the Hazard Communications Standard promulgated by the Secretary of Labor on the authority of the Occupational Safety and Health Act of 1970 (OSH Act)[1], Pub.L. 91–596, 84 Stat. 1590, 29 U.S.C. § 651 *et seq.* (1982). Certain intervenors challenge our jurisdiction to consider the petitions pursuant to 29 U.S.C. § 655(f) (1982), contending that the action under review is a regulation rather than a

---

* Hon. Clarkson S. Fisher, Chief Judge, United States District Court for the District of New Jersey, sitting by designation.

** Hon. James M. Kelly, United States District Court Judge for the Eastern District of Pennsylvania, sitting by designation.

1. Petitions for judicial review of the standard were filed on November 22, 1983, in this Court by the United Steelworkers of America, AFL–CIO, and by Public Citizen, Inc., representing itself and a number of labor groups. Motions to intervene in these cases were received from the Chemical Manufacturers Association, the American Petroleum Institute, the National Paint and Coatings Association, and the States

---

standard. Petitioners and the Secretary urge that we have jurisdiction. Petitioners and intervenors challenge the standard on several substantive grounds, while the Secretary defends it. We conclude that the petitions for review are properly here, and thus address the substantive challenges.

## I.

### *Evolution of the Standard*

Section 6 of the OSH Act directs the Secretary of Labor to promulgate occupational safety and health standards to further the purpose of the Act "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions...." 29 U.S.C. §§ 651(b) and 655(b)(1) (1982). Any standard promulgated by the Secretary

> shall prescribe the use of labels or other appropriate forms of warning as are necessary to insure that employees are apprised of all hazards to which they are exposed, relevant symptoms and appropriate emergency treatment, and proper conditions and precautions of safe use or exposure.

29 U.S.C. § 655(b)(7) (1982).

In 1974, the National Institute for Occupational Safety and Health (NIOSH), an agency created by section 22 of the OSH Act, 29 U.S.C. § 671 (1982), recommended that the Secretary promulgate a standard requiring employers to inform employees of potentially hazardous materials in the workplace. 47 Fed.Reg. 12095 (1982). Later that year the Secretary appointed an

---

of New York, Connecticut, and New Jersey. In addition, petitions for review of the standard were filed by the State of Massachusetts in the First Circuit (No. 84–1063; Jan. 24, 1984); the State of New York in the Second Circuit (No. 83–4220; Dec. 20, 1983); the State of Illinois in the Seventh Circuit (No. 84–1111; Jan. 23, 1984); the Flavor and Extract Manufacturers' Association in the Fourth Circuit (No. 83–2151; Dec. 12, 1983); and the Fragrance Materials Association in the District of Columbia Circuit (No. 84–1021; Jan. 18, 1984). These cases were subsequently transferred to this Court and consolidated in this proceeding. The cases brought by the Flavor and Extract Manufacturers' Association and the Fragrance Materials Association have since been withdrawn.

advisory committee to develop standards for implementation of the statutory provision requiring labels or other appropriate forms of warning. That advisory committee issued its report on June 6, 1975, recommending a classification of hazards, the use of warning devices such as labels and placards, disclosure of chemical data, and employee training programs. *Id.* at 12096.

The 1975 Committee report did not result in prompt action by the Secretary. In 1976 a House of Representatives subcommittee held oversight hearings during which several committee members expressed concern over the Secretary's failure to promulgate a comprehensive Hazard Communication Standard. *Control of Toxic Substances in the Workplace: Hearings Before the Subcomm. on Manpower and Housing of the House Comm. on Government Operations*, 94th Cong. 2d Sess. 87, 89–90 (1976). Seventeen months later, the full House Committee on Government Operations issued a Report which criticized the agency for "miserly use of its delegated powers to deal with disease and death-dealing toxic substances." House Comm. on Government Operations, *Failure to Meet Commitments Made in the Occupational Safety and Health Act*, H.R.Rep. No. 710, 95th Cong., 1st Sess. 13 (1977). The Committee concluded that:

> The Department of Labor should exercise its power under the Occupational Safety and Health Act to insure that employers and workers can and will know what kinds of toxic dangers are present in the Nation's workplaces. OSHA should require chemical formulators to identify any regulated substance in products they sell.

*Id.* at 15.

Eventually, on January 16, 1981, the agency published a notice of proposed rulemaking entitled "Hazards Identification." 46 Fed.Reg. 4412–53. The standard proposed would be applicable to employers in Division D, Standard Industrial Classification Codes 20–39, which include only employers in the manufacturing sector. *Id.* at 4426. This classification of employers is made by type of activity for the purpose of promoting uniformity and comparability in the presentation of statistical data. Executive Office of the President, Office of Management and Budget, *Standard Industrial Classification Manual* 9 (1972). This initial proposal was withdrawn by the Secretary on February 12, 1981, for further consideration of regulatory alternatives. 46 Fed.Reg. 12214. The notice of proposed rulemaking which resulted in the rule challenged in the instant proceedings, entitled "Hazard Communication," was published on March 19, 1982. 47 Fed.Reg. 12091. Like the January 16, 1981 proposal, it was limited to employers in the manufacturing sector. The most significant difference from the rule proposed in 1981 was the inclusion in the March 19, 1982 proposal of a trade secret exception to the requirement that the chemical identities of all hazardous chemicals be disclosed. *Compare* 46 Fed. Reg. 4426 (1981) *with* 47 Fed.Reg. 12105 (1982).

The standard was published in its final form on November 25, 1983. 48 Fed.Reg. 53279. It requires that chemical manufacturers and importers "evaluate chemicals produced in their workplaces or imported by them to determine if they are hazardous." 29 C.F.R. § 1910.1200(d)(1) (1984). It refers to several compilations of toxic materials. These lists establish a floor of toxic substances which chemical manufacturers or importers must treat as hazardous. 29 C.F.R. § 1910.1200(d)(3) (1984). Chemicals not included in the designated compilations must be evaluated for hazardousness by reference to "available scientific evidence." 29 C.F.R. § 1910.1200(d)(2) (1984). A manufacturer or importer of chemicals found to be hazardous must "ensure that each container ... leaving the workplace is labeled" with the chemical identity, with appropriate hazard warnings, and with the name and address of the source. 29 C.F.R. § 1910.1200(f)(1) (1984). Manufacturers or importers must also prepare a "material safety data sheet" (MSDS) containing the chemical common names of each hazardous ingredient, and information necessary for safe use of the product. 29 C.F.R. § 1910.1200(g) (1984). The MSDS

must be provided to each employer in the manufacturing sector (Standard Industrial Classification Codes 20–39) purchasing a hazardous chemical. That employer must in turn make the MSDS available for employee inspection, 29 C.F.R. § 1910.1200(g)(8) (1984), and "shall provide employees with information and training on hazardous chemicals in their work area...." 29 C.F.R. § 1910.1200(h) (1984).

The rule allows an exception from the labeling and MSDS ingredient disclosure requirements when a chemical manufacturer or importer claims that the chemical identity is a trade secret. 29 C.F.R. § 1910.1200(i) (1984). In such a case, the manufacturer or importer must provide a MSDS disclosing the hazardous properties of the chemical and suggesting appropriate precautions. In the case of a medical emergency, the manufacturer or importer must disclose the chemical identity to a treating physician or nurse, and may later require such a health professional to sign a confidentiality agreement. 29 C.F.R. § 1910.1200(i)(2) (1984). Absent a medical emergency, the manufacturer or importer may be required to disclose the chemical identity to a health professional who makes a written request detailing the occupational need for the information, and who is willing to sign a confidentiality agreement containing a liquidated damages clause. 29 C.F.R. § 1910.1200(i)(3) & (4) (1984). In no case is the manufacturer required to disclose the precise formula, as opposed to the identity of chemicals in the compound.

The rule provides expressly that:
[t]his occupational safety and health standard is intended to address comprehensively the issue of evaluating and communicating chemical hazards to employees in the manufacturing sector, and to preempt any state law pertaining to this subject.

29 C.F.R. § 1910.1200(a)(2) (1984). Thus, at least insofar as they might require hazard communication to employees in the manufacturing sector, state hazard disclosure laws are claimed to be preempted by the rule.

## II.

### Jurisdiction Under Section 6(f) of the OSH Act

Congress has in section 6 of the OSH Act authorized the Secretary to issue health and safety standards. 29 U.S.C. § 655 (1982). In section 8(c)(3) of the Act, Congress also authorized the Secretary to issue regulations requiring employers to keep records and inform employees of worker exposure to potentially toxic materials or harmful physical agents. 29 U.S.C. § 657(c)(3) (1982). Classification of the Hazard Communication Standard as a section 6 standard or a section 8 regulation will have two interrelated consequences.

First, Congress has vested in the courts of appeals jurisdiction over challenges to the validity of section 6 standards. 29 U.S.C. § 655(f) (1982). Congress has made no such decision with respect to judicial review of section 8 regulations. These are reviewable in the district courts pursuant to the Administrative Procedure Act. 5 U.S.C. § 703 (1982). Thus if the Hazard Communication Standard is a section 8 regulation the only course open to us would be to transfer the petitions for review to an appropriate district court. 28 U.S.C. § 1631 (1982). A court of appeals would reach the merits of a dispute over a regulation, therefore, only on an appeal from a judgment of the district court.

Second, by whatever route the case arrived in a court of appeals, whether the challenged rule is a section 6 standard or a section 8 regulation affects its preemptive effect on state law. Section 18(a) of the OSH Act provides explicitly:

Nothing in this chapter shall prevent any State agency or court from asserting jurisdiction under State law over any occupational safety or health issue with respect to which no standard is in effect under section 655 of this title.

29 U.S.C. § 667(a) (1982). If, however, a section 6 standard has been adopted, the role of the states is circumscribed by section 18(b) which provides:

Any State which, at any time, desires to assume responsibility for development

and enforcement therein of occupational safety and health standards relating to any occupational safety or health issue with respect to which a Federal standard has been promulgated under section 655 of this title shall submit a State plan for the development of such standards and their enforcement.

29 U.S.C. § 667(b) (1982). The Secretary must accept such a state plan if it "will be at least as effective in providing safe and healthful employment" as the OSHA standards. 29 U.S.C. § 667(c)(2) (1982).

The intervenor states all have hazard disclosure laws which, if not preempted, would be operative in the manufacturing sector. None contend, however, that they have submitted and have obtained approval of their plans pursuant to section 18. Given the explicit language of sections 18(b) and (c), the conclusion is inescapable that if the rule in issue is a section 6 standard it preempts state law until a state obtains section 18 approval of a state plan. It is not likely that the states challenging the rule will seek such approval, for section 18 contemplates that if they do so, they take on the fiscal burdens of enforcement now borne by the United States. 29 U.S.C. § 667(c)(5) (1982).

Since the disclosure requirements of laws adopted by the intervening states are in several respects stricter than those adopted by the Secretary, it is not surprising that those states would have us classify the challenged rule as a section 8 regulation rather than a section 6 standard. The preemptive effect of a section 8 regulation is not dealt with explicitly in the OSH Act, and any implied preemption would require a finding that it is impossible to comply with both federal and state law, or that "the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Silkwood v. Kerr-McGee Corporation*, 464 U.S. 238, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984). It is not likely that we could make either such finding.

The agency decision to include in its rule an express provision preempting state law would, if the rule is a section 8 regulation

rather than a standard, be reviewable pursuant to the Administrative Procedure Act. *Fidelity Federal Savings and Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982). The Secretary's inclusion of an express reference to preemption in the manufacturing sector appears to have been motivated at least in part by the desire to reduce the regulatory burden posed by multiple state laws. 48 Fed.Reg. 53284 (1983). That purpose is arguably at odds with congressional intention that the OSH Act provide a federal floor for safety in the workplace. Reduction of burdens posed by multiple state laws does not appear to have been a significant congressional concern; rather, Congress favored a uniform federal law so that those states providing vigorous protection would not be disadvantaged by those that did not. Subcomm. on Labor of the Sen. Comm. on Labor and Public Welfare, 92d Cong., 1st Sess., Legislative History of the Occupational Safety and Health Act of 1970, Pub.L. No. 91–596, at 144, 413, 444 (1971). We need not, however, decide whether preemption would be implied, or whether the preemption provision of the rule itself is valid as a section 8 regulation, if we conclude that the rule is a section 6 standard, for, as noted above, such standards are explicitly preemptive under the statute.

The Act provides no definition of the term "regulation." The term "occupational safety and health standard" is defined as

a standard which requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment.

29 U.S.C. § 652(8) (1982). This definition is not helpful in the task of differentiating between standards and regulations, for it can hardly be said to exclude the dictionary definition of the term regulation.

The states urge that the difference between section 6 standards and section 8 regulations must be determined by looking at the separate purposes behind the two provisions. Section 6 standards, they urge,

serve two purposes: (1) to improve safety in the workplace by removing specific and already-identified hazards; and (2) to provide objective criteria capable of immediate application. Section 8 regulations, they urge, are designed, not for the elimination of specific and already-identified hazards, but for such purposes as the facilitation of investigation and enforcement. The states place principal reliance, in this regard, upon *Louisiana Chemical Association v. Bingham,* 657 F.2d 777, 782–83 (5th Cir.1981), in which the court classified the agency's Records Access rule as a section 8 regulation. The court in *Louisiana Chemical Association* held that before proceeding to the merits of a section 6(f) petition for review it must determine "whether the challenged rule reasonably purports to correct a particular 'significant risk' or instead is merely an enforcement or detection procedure designed to further the goals of the Act generally." *Id.* at 782. It concluded that the Records Access rule was a section 8 regulation.

The quoted distinction provides a convenient test for identifying standards, which this rule satisfies. While both the Records Access rule and the Hazards Communication rule have in common the object of communicating hazard information to employees, the former only provides for access to records maintained by an employer for other purposes, while the latter is aimed at eliminating the specific hazard that employees handling hazardous substances will be more likely to suffer impairment to their health if they are ignorant of the contents of those substances. The Secretary found that inadequate communication is itself a hazard, which the standard can eliminate or mitigate. 48 Fed.Reg. 53321 (1983). *See also* 48 Fed.Reg. 53282–83, 53323–24, 53327–29 (1983).

The State of New York urges that a communication rule can never be a standard, because it does not provide for diminution of risk through improved protection or reduced exposure. The Secretary found, however, that risk of harm can be greatly reduced by direct warning to employees, who are in the best position to assure that dangerous substances are handled in the safest possible manner. 47 Fed.Reg. 12112. Moreover New York's interpretation of section 6 is inconsistent with the inclusion therein of the direction to the Secretary to promulgate standards which "prescribe the use of labels or other appropriate forms of warning as are necessary to insure that employees are apprised of all hazards to which they are exposed...." 29 U.S.C. § 655(b)(7) (1982). Finally, while we exercise independent judgment as to the distinction between a section 6 standard and a section 8 regulation, the interpretation of those provisions of the OSH Act by the agency charged with its implementation should be afforded some degree of deference. The Secretary has classified the rule as a standard, and urges that the petition for review is properly here.

■ We conclude, therefore, that the Hazard Communication Standard is a section 6 standard reviewable in this court pursuant to section 6(f).

### III.

*Preemption of State Hazard Communication Rules in the Manufacturing Sector*

Our analysis of the jurisdictional issue disposes of the states' objection to preemption of their hazard disclosure laws with respect to employees in the manufacturing sector. The Hazard Communication Standard, to the extent it is valid, as a section 6 standard, applies to the exclusion of state disclosure laws which have not been approved in accordance with section 18.

■ Massachusetts, Illinois, New Mexico, and West Virginia raise the question whether the federal Hazard Communication Standard operates to preclude state laws outside the manufacturing sector. The Secretary does not contend that the Standard has such an effect. 48 Fed.Reg. 53284; Respondent's Brief at 84–89. He urges, as well, that the issue of the standard's operation outside that sector is not ripe for review. To the extent that the states seek a declaration that their hazard

disclosure laws may operate outside the manufacturing sector, we agree that it would be premature to make such a declaration in this case. The Secretary does not urge that they may not so operate, but other parties not before us might present reasons, such as unseverability as a matter of state law, which have not been litigated before this court. We hold only that, to the extent it is valid, the federal Hazard Communication Standard preempts state hazard disclosure laws with respect to disclosure to employees in the manufacturing sector.

## IV.

### Challenges to Validity of the Standard

#### A. Scope of Review

Petitioners' challenges to the validity of the standard present three issues: (1) its limited application to the manufacturing sector; (2) the failure to adopt as a list of hazardous substances the Registry of Toxic Effects of Chemical Substances (RTECS) compiled by NIOSH; and (3) the inclusion of the trade secret exemption. We consider the validity of those aspects of the rule under the hybrid review scheme of section 6(f), which refers us to substantial evidence in the rulemaking proceeding. We first interpreted section 6(f) in *Synthetic Organic Chemical Manufacturers Association v. Brennan*, 503 F.2d 1155 (3d Cir. 1974), *cert. denied*, 420 U.S. 973, 95 S.Ct. 1396, 43 L.Ed.2d 653 (1975). We noted that section 6(e) of the OSH Act requires that whenever the Secretary promulgates a standard he must publish a statement of the reasons for that action in the Federal Register. *Id.* at 1159–60. We held that these published reasons are subject to judicial review, and that they must be consistent with the language and purpose of the OSH Act. We held, further, that judicial review of a standard involves at least five steps:

(1) determining whether the Secretary's notice of proposed rule making adequately informed interested persons of the action taken;

(2) determining whether the Secretary's promulgation adequately sets forth reasons for his action;

(3) determining whether the statement of reasons reflects consideration of factors relevant under the statute;

(4) determining whether presently available alternatives were at least considered; and

(5) if the Secretary's determination is based in whole or in part on factual matters subject to evidentiary development, whether substantial evidence in the record as a whole supports the determination.

*Id.* at 1160. This approach to judicial review under section 6(f) has since been consistently followed. *See, e.g., American Iron and Steel Institute v. Occupational Safety and Health Administration*, 577 F.2d 825, 830–31 (3d Cir.1978), *cert. granted*, 448 U.S. 909, 100 S.Ct. 3054, 65 L.Ed.2d 1139 (1980), *cert. dismissed*, 448 U.S. 917, 101 S.Ct. 38, 65 L.Ed.2d 1180 (1980); *Atlantic & Gulf Stevedores, Inc. v. Occupational Safety and Health Review Commission*, 534 F.2d 541, 551 (3d Cir.1976); *AFL–CIO v. Brennan*, 530 F.2d 109, 114 (3d Cir.1975). Moreover we have held that "in a § 6(f) proceeding the Secretary has an affirmative burden to demonstrate the reasonableness of an adopted standard." *Atlantic & Gulf Stevedores*, 534 F.2d at 551.

In this case no petitioner or intervenor questions the adequacy of the Secretary's notice of proposed rulemaking. Our review, therefore, involves the other four *Synthetic Organic* factors.

#### B. Limitation of Coverage to the Manufacturing Sector

None of the petitioners still before us contend that the manufacturing sector should not be covered by a hazard communication standard. The Secretary's decision to provide coverage only for employees in the manufacturing sector is based on a finding that this sector, which includes 32% of total employment, accounts for more than 50% of the reported cases of illness due to chemical exposure. 48 Fed. Reg. 53285 (1983). From this datum the Secretary determined that employees in the manufacturing sector have the greatest risk of experiencing health effects due to

chemical exposure. *Id.* Agricultural employees have a higher chemical source incidence rate than manufacturing employees. The Secretary discounted this datum, however, because 80% of the reported chemical source cases among agricultural workers involved skin illnesses from handling plants, which would not be regulated by the proposed Hazard Communication Standard. *Id.* Moreover the Secretary concluded that the Environmental Protection Administration has, under the Federal Insecticide, Fungicide and Rodenticide Act, exercised jurisdiction over regulation of field use of pesticides. Excluding agricultural employees, there is substantial evidence in the record that the manufacturing sector has the highest incidence rate of chemical exposures which the Agency has authority to regulate.

Several petitioners, while conceding that the finding about incidence rate of illnesses in the manufacturing sector is supported by substantial evidence, contend that the Secretary's exclusion of other sectors, such as service, construction, and agriculture, is unsupported by reasons that are consistent with the purposes of the statute. They urge that while the incidence rate for employees in the manufacturing sector is high overall, some employees in specific non-manufacturing categories, such as hospital workers, are exposed to a greater number of toxic substances than are typical workers in the manufacturing sector. Moreover some workers in specific non-covered industries have higher reported rates of chemical source illness and injury than do workers in many covered industries. The Standard Industrial Classification breakdown, they contend, is not relevant to the statute, since that classification is made for a myriad of statistical purposes, mainly economic, having little to do with exposure to hazards. The result of the standard is that spray painters in the manufacturing sector, for example, must be provided with MSDS's and with information and training on hazardous chemicals in the products they use, while spray painters in the construction industry using the same products are not so protected.

In explaining the limited coverage, the Secretary reasoned:

It should be emphasized that the Agency does not believe that employees in other industries are not exposed to hazardous chemicals, or that they should not be informed of those hazards. OSHA has merely exercised its discretion to establish rulemaking priorities, and chosen to first regulate those industries with the greatest demonstrated need.

45 Fed.Reg. 53286. Rejecting arguments of participants in the rulemaking proceeding that other workers, such as painters in the construction industry, are exposed to the same hazards as are workers in the manufacturing sector, the Secretary reasoned:

As stated previously, OSHA acknowledges that exposures to hazardous chemicals are occurring in other industries as well. A limited coverage of them is included in the final standard since all containers leaving the workplace of chemical manufacturers, importers, or distributors will be labeled, regardless of their intended destination. This will alert downstream users to the presence of hazardous chemicals, and the availability of material safety data sheets. The Agency contends that the focus of this standard should remain on the manufacturing sector since that is where the greatest number of chemical source injuries and illnesses are occurring. This focus will also serve to ensure that hazard information is being generated for chemicals produced or imported into this country, and this increased availability will benefit all industry sectors.

*Id.* The Secretary's reasoning does not address the petitioners' contention that reliance on the Standard Industrial Classification is inappropriate because it ignores the high level of exposure in specific job settings outside the manufacturing sector.

The Secretary maintains that section 6(g) of the Act affords him unreviewable discretion to determine what industries shall be covered by a standard. That section provides in relevant part:

In determining the priority for establishing standards under this section, the Secretary shall give due regard to the urgency of the need for mandatory safety and health standards for particular industries, trades, crafts, occupations, businesses, workplaces or work environments.

29 U.S.C. § 655(g) (1982). We reject the Secretary's contention that his priority-setting authority under section 6(g) vitiates judicial review of his determination that only the manufacturing industry need be covered by the Hazard Communication Standard. Section 6(g) must be read in conjunction with section 6(f), which provides for judicial review of standards. Indeed the language "due regard to the urgency of the need for mandatory safety standards for particular industries" suggests to us a statutory standard by which to measure the exercise of the Secretary's priority-setting discretion.[2] In *United Steelworkers of America v. Marshall*, 647 F.2d 1189, 1309–10 (D.C.Cir.1980), *cert. denied*, 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981), the court reviewed under section 6(f) the Secretary's decision to exempt the construction industry from a standard limiting exposure to lead. Although the court did not explicitly address section 6(g), it implicitly rejected the contention that the Secretary's priority-setting authority is unreviewable. We do so explicitly.

■ Our difficulty with the Secretary's reliance on section 6(g) arises from the Secretary's failure to explain why coverage of workers outside the manufacturing sector would have seriously impeded the rulemaking process. Section 6(g) clearly permits the Secretary to set priorities for the use of the agency's resources, and to promulgate standards sequentially. Once a standard has been promulgated, however, the Secretary may exclude a particular industry only if he informs the reviewing court, not merely that the sector selected for coverage presents greater hazards, but also why it is not feasible for the same

standard to be applied in other sectors where workers are exposed to similar hazards. *See United Steelworkers*, 647 F.2d at 1309–10. The explanation for the Secretary's action quoted above is deficient in the latter respect. Thus the Secretary has failed to carry the burden of persuading us that section 6(g) justifies limitation of coverage to the manufacturing sector.

We are also unpersuaded by the Secretary's contention that the communication rule will "trickle down" to uncovered workers because containers will be labeled. Section 6(b)(5) requires that:

The Secretary, in promulgating standards dealing with toxic materials or other harmful physical agents ... shall set the standard which most adequately assures, to the extent feasible, on the basis of the best available evidence, that no employee will suffer material impairment of health or functional capacity even if such employee has regular exposure to the hazard dealt with by such standard for the period of his working life.

29 U.S.C. § 655(b)(5) (1982). There is record evidence that workers in sectors other than manufacturing are exposed to the hazards associated with use of toxic materials or other harmful physical agents. The Secretary has given no statement of reasons why it would not be feasible to require that those workers be given the same MSDS's and training as must be given to workers in the manufacturing sector. Section 6(c)(7) provides that:

Any standard ... shall prescribe the use of labels or other appropriate forms of warning as are necessary to insure that employees are apprised of all hazards to which they are exposed, relevant symptoms and appropriate emergency treatment, and proper conditions and precautions of safe use or exposure.

29 U.S.C. § 655(c)(7) (1981). The Secretary has given reasons why the labeling, MSDS, and instruction requirements comply with section 6(c)(7) for employees in the manufacturing sector, but no explanation why the same information is not needed for

---

2. The Secretary urges that *Public Citizen Health Research Group v. Marshall*, 485 F.Supp. 845

(D.D.C.1980) supports his interpretation of section 6(g). If it does, we decline to follow it.

workers in other sectors exposed to industrial hazards. Such a statement of reasons is required by section 6(f). *Snythetic Organic*, 503 F.2d at 1160.

We hold, therefore, that the petitions for review of those petitioners who object to the limitation of the Hazard Communication Standard must be granted. That standard may continue to operate in the manufacturing sector, but the Secretary's explanation for excluding other sectors does not withstand the scrutiny mandated by section 6(f). Thus the Secretary will be directed to reconsider the application of the standard to employees in other sectors and to order its application to other sectors unless he can state reasons why such application would not be feasible. 29 U.S.C. § 655(b)(5).

### C. Failure to Incorporate the RTECS Hazard List

While the Hazard Communication Standard includes several lists of substances which chemical manufacturers and importers must treat as hazardous, the Standard places primary responsibility for determining which products are hazardous on the chemical manufacturer or importer. 29 C.F.R. § 1910.1200(d)(1) (1984). Petitioner Public Citizen urges that the Secretary should have adopted the RTECS list compiled by NIOSH. The agency found that the hazard determination procedure provided the most protective coverage possible by establishing standards to guide manufacturers in determining whether a substance is hazardous. 48 Fed.Reg. 53299. It rejected use of the RTECS list, finding that it was overinclusive because it encompasses "potential" as well as "identifiable" hazards, *id.* at 53298, and that it was underinclusive because no one list can remain suitably up-to-date, *id.* at 53296. These findings are supported by the Introduction to the RTECS list in which the editor explains that "[t]he absence of a substance from the Registry does not imply that the substance is non-toxic, and thus non-hazardous, any more than the presence of a substance in the Registry indicates that the substance is hazardous in common use." NIOSH, Registry of Toxic

Effects of Chemical Substances (RTECS) Introduction xi (July 1984). Indeed the editor notes that the RTECS list includes substances that are common in everyday life and in nearly every household. *Id.* at x.

■ The Public Citizen contends that OSHA's determination that the RTECS list is inappropriate is belied by the Agency's use of that list in its Records Access rule, *see Louisiana Chemical Association v. Bingham*, 657 F.2d 777, 783 & n. 10 (5th Cir.1981). The Records Access rule, which merely requires that employers make available those records which are kept anyway, imposes a much lighter burden on employers than the Hazard Communication Standard. Because the purposes and requirements of the two rules are not identical, it was reasonable for the Secretary to conclude that the hazard determination procedure for each rule need not be identical. We conclude that the Secretary's rejection of the RTECS list as overinclusive is supported by substantial evidence and is consistent with the OSH Act's statutory purposes.

### D. The Trade Secret Exemption

Several petitioners challenge the inclusion in the Hazard Communication Standard of a "trade secret" exception. 29 C.F.R. § 1910.1200(i) (1984). They contend that the agency has defined "trade secret" too broadly, and that the conditions under which workers may obtain information claimed to be a trade secret are unduly burdensome.

#### 1. The Definition of Trade Secret

Trade secret protection may arise from two sources: state law or a federal statute. *Ruckelshaus v. Monsanto Co.*, —— U.S. ——, ——, 104 S.Ct. 2862, 2872, 81 L.Ed.2d 815 (1984); *Chevron Chemical Co. v. Costle*, 641 F.2d 104, 115 (3d Cir.), *cert. denied*, 452 U.S. 961, 101 S.Ct. 3110, 69 L.Ed.2d 972 (1981). The OSH Act does not create substantive trade secret protection. It deals with that subject in section 15, which provides:

All information reported to or otherwise obtained by the Secretary or his representative in connection with any in-

spection or proceeding under this chapter which contains or which might reveal a trade secret referred to in section 1905 of Title 18 shall be considered confidential for the purpose of that section, except that such information may be disclosed to other officers or employees concerned with carrying out this chapter or when relevant in any proceeding under this chapter. In any such proceeding the Secretary, the Commission, or the court shall issue such orders as may be appropriate to protect the confidentiality of trade secrets.

29 U.S.C. § 664 (1982). The cross-reference to the Trade Secrets Act, 18 U.S.C. § 1905 (1982) confirms that Congress intended section 15 to protect against agency disclosure or misuse of data submitted to it under an expectation that the agency would treat that data as a trade secret to the extent that applicable state law did so. *See Ruckelshaus v. Monsanto, supra,* —— U.S. at ——, 104 S.Ct. at 2876. Section 15 cannot be read as authorizing the creation of trade secret protection going beyond that afforded under state law. Moreover that section deals only with what the agency and its employees may disclose, not with what disclosures the agency may compel in the interest of safety in the workplace.

The Secretary contends that while section 15 deals with disclosures by the agency and its employees, it embodies a recognition by Congress of the significance in the economy of state law trade secret protection, and that it was quite appropriate, in drafting the Hazard Communication Standard, to balance that recognition against the competing congressional concern over safety in the workplace. *See* 48 Fed.Reg. 53312 (1983). Aside from section 15, however, the Secretary points to no provision in the OSH Act authorizing such balancing. Indeed trade secret protection is not even mentioned in section 6, which directs that "[t]he Secretary ... shall set the standard which most adequately assures, to the extent feasible, on the basis of the best available evidence, that no employee will suffer material impairment of health...." 29 U.S.C. § 655(b)(5). The quoted provision

indicates that Congress struck a balance in favor of safety in the workplace at the expense of competing interests. In a slightly different context, the Supreme Court held that in section 6(b)(5), "Congress itself defined the basic relationship between costs and benefits, by placing the 'benefit' of worker health above all other considerations save those making attainment of this 'benefit' unachievable." *American Textile Manufacturers Institute v. Donovan,* 452 U.S. 490, 509, 101 S.Ct. 2478, 2490, 69 L.Ed.2d 185 (1981).

The Secretary originally proposed that while traditional trade secrets such as chemical formula and process information could be withheld, chemical identity information must be disclosed. 46 Fed.Reg. at 4426 (1981). When representatives of the chemical industry commented on the importance of trade secrets to the economic health of that industry, *see* 48 Fed.Reg. 53312–14 (1983), the Secretary adopted an entirely new approach. First, it defined a trade secret as:

> [A]ny confidential formula, pattern, process, devise, information or compilation of information (including chemical name or other unique chemical identifier) that is used in an employer's business, and that gives the employer an opportunity to obtain an advantage over competitors who do not know or use it.

29 C.F.R. § 1910.1200(c) (1984). The Secretary contends that this definition was adopted from section 757 of the Restatement of Torts, 48 Fed.Reg. 53314. In fact, however, inclusion of the parenthetical "(including chemical name or other unique chemical identifier)" not found in section 757, enlarges considerably the Restatement definition. The Secretary's comments indicate that the definition provides trade secret protection for chemical identity which is determinable by reverse engineering. *Id.* This type of information has not traditionally been afforded trade secret protection under state law. *See Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 476, 94 S.Ct. 1879, 1883, 40 L.Ed.2d 315 (1974). The Restatement provides that information that may be properly acquired or duplicated

without great difficulty should not be considered a trade secret. Restatement of Torts, § 757, comment b. The Secretary justified the enlargement of the Restatement definition, reasoning:

Many products can be reverse engineered if sophisticated analytical techniques are applied, yet cannot be if less advanced technology is used. The determination of what is "practical" in terms of reverse engineering capability rests with this degree of analysis, rather than with a definitive finding of "ability" to be reverse engineered or not. Furthermore, the definition of a trade secret says that the competitor or potential competitor does not know *or* use the information. Thus, even though a competitor could theoretically "reverse engineer" and discover the components of a product, if this information is not in fact used, it remains a *bona fide* trade secret.

48 Fed.Reg. 53314 (emphasis in original). Plainly the Secretary has provided greater protection for chemical manufacturers and importers than that afforded in those states utilizing the Restatement of Torts trade secret definition. Even the Restatement definition, moreover, goes beyond the protection afforded to trade secrets in other regulatory contexts. *See Public Citizen Health Research Group v. Food and Drug Administration,* 704 F.2d 1280, 1287 (D.C. Cir.1983) (Food and Drug Administration's adoption of Restatement of Torts trade secret definition inconsistent with Freedom of Information Act).

Section 15 deals only with disclosure by the agency or its employees, and section 6(b)(5) does not permit the Secretary to balance employee safety against competing economic concerns. No other statutory provision has been called to our attention which would justify enlarging trade secret protection beyond that afforded by state law. Indeed it seems plain that state law cannot prevent the implementation of section 6 safety standards that are otherwise feasible. It appears that the unarticulated premise of the Secretary's concern about protecting trade secrets is that they may be constitutionally protected from the regulatory process. In *Westinghouse Electric Corp. v. United States Nuclear Regulatory Commission,* 555 F.2d 82, 95 (3d Cir. 1977), we rejected a constitutional challenge to rules requiring disclosure of proprietary information as a condition to licensing. The *Westinghouse* holding is supported by the Supreme Court's holding in *Ruckelshaus v. Monsanto Co.,* — U.S. —, —, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984), that a trade secret voluntarily disclosed to the E.P.A. in exchange for a registration to sell pesticides is not protected if the owner had notice at the time of disclosure that the E.P.A. was authorized to use all data submitted. These cases suggest that a regulation requiring the disclosure even of formula or process information as a precondition for the sale of hazardous products for use in the workplace would be valid. *See* McGarity and Shapiro, *The Trade Secret Status of Health and Safety Testing Information: Reforming Agency Disclosure Policies,* 93 Harv.L.Rev. 837, 864–67 (1980). None of the petitioners urge that the Secretary should have required disclosure to that extent. They do contend, however, that the OSH Act does not authorize the Secretary to promulgate a regulation granting more protection to information claimed to be confidential than is afforded by state law.

■ We agree that there is no legal justification for affording broader trade secret protection in the Hazard Communication Standard than state law affords. No petitioner urges that the Secretary's original proposal, which would have protected formula and process information but required disclosure of hazardous ingredients, is inadequate. That proposal was consistent with "[t]he general policy of OSHA ... that the interests of employee safety and health are best served by full disclosure of chemical identity information." 48 Fed. Reg. 53312 (1983). The petition for review will therefore be granted and the proceedings remanded to the Secretary for reconsideration of the definition of trade secrets, which definition shall not include chemical

identity information that is readily dis-coverable through reverse engineering.

## 2. The Access Rule

In addition to objections to the definition of trade secrets, several petitioners challenge the provisions of the Hazard Communication Standard relating to access to the allegedly confidential information. The petitioners contend that once a manufacturer raises a claim of trade secret, the Standard places overly stringent procedural barriers to the discovery of information relevant to the assessment of health hazards. These objections go to: a) the requirement that the request be in writing with a statement of need; b) the limitation of access to "health professionals"; and c) the requirement that a confidentiality agreement with a liquidated damages clause be signed. 29 C.F.R. § 1910.1200(i).

### a) The Written Request Requirement

█ The Secretary justifies the requirement that a request for trade secret information be in writing with supporting documentation as a means of facilitating dispute resolution:

> Then if the matter is to be referred to OSHA to settle any dispute between the requesting party and the employer protecting a trade secret, the Agency will be able to base a decision upon a review of these written materials. Should the matter not be resolved to the satisfaction of all parties, it may result in a citation and referral to the Occupational Safety and Health Review Commission (OSHRC) for judicial review.

48 Fed.Reg. at 53315. The tendered justification is both reasonable and consistent with the purposes of the Act.

### b) The Restriction of Access to Health Professionals

The restriction limiting access to trade secrets to health professionals is more troublesome. Commentators on the proposed standard were generally in agreement that trade secret chemical identity information must be disclosed at least to a treating physician. *Id.* at 53316. The Secretary concluded that other health professionals, particularly those engaged in the prevention of disease or injury, had a legitimate need for chemical identity information. *Id.* at 53318. It declined, however, to authorize direct employee access to specific chemical identities of hazardous substances for which a trade secret is claimed. *Id.* The Secretary advances three rationales to justify restricting employee access to secret chemical identity information.

One reason is that "by and large professional training would be required" for any purpose that would amount to a "need to know" confidential information. *Id.* The United Steelworkers of America, AFL–CIO–CLC, a petitioner, points to a number of instances in the record, however, where non-health-professional workers used chemical identity information to improve workplace safety. They urge that employees and local union safety officers, although not health professionals, have often received training in health and safety, and thus know how to use the basic literature on chemical hazards, and know how to obtain technical assistance. Steelworkers' brief at 40.

A second reason advanced by the Secretary for allowing access only to health professionals, and not directly to employees, is that "providing access to trade secret chemical identities only to health professionals on a confidential basis will protect these employees adequately." 48 Fed.Reg. at 53318. The Steelworkers point to record evidence, however, that it is quite difficult for many workers to obtain the services of a health professional, at least prior to the need for treatment. Steelworkers' brief at 41–42. There is no substantial evidence in the record that significant numbers of unorganized workers will be able to obtain the services of a health professional prior to the time that treatment becomes necessary. Even for organized workers, the record evidence suggests that few local unions retain health professionals.

■ The Secretary's final justification for limiting access to health professionals involves the risk of disclosure.

> This is not to say that "downstream" employees are more likely to disclose trade secrets or violate confidentiality agreements than health professionals, but it is an unmistakable fact that the more people who have access to confidential information, the more difficult it is to preserve its secrecy or to locate the source of a leak if one occurs.

48 Fed.Reg. at 53318. The Secretary correctly notes that the chance of a leak increases as the number of people having access to information increases. The issue posed by the petitioners, however, is not the number of persons obtaining access, but the type of persons. There is no record evidence supporting the Secretary's apparent conclusion that employees who are not health professionals will be more likely to breach a confidentiality agreement than would the same number of health professionals. We conclude that the restriction in the Hazard Communication Standard of access to trade secret information to health professionals is not supported by substantial evidence in the record, and is inconsistent with the mandate of section 6(b)(5) that OSHA promulgate the standard that "most adequately assures, to the extent feasible, on the basis of the best available evidence, that no employee will suffer material impairment of health...." 29 U.S.C. § 655(b)(5).

#### c) The Confidentiality Agreement Requirement

■ The Standard requires that, except in a medical emergency, a manufacturer which receives a request for trade secret information may require that the requester sign a confidentiality agreement containing a liquidated damages clause. 29 C.F.R. § 1910.1200(i)(3)(v) (1984). The Standard minimizes the risk that employers will make excessive demands for liquidated damages clauses by providing that the agreement "[m]ay not include requirements for the posting of a penalty bond," but only "a reasonable pre-estimate of likely damages...." 29 C.F.R. § 1910.-1200(i)(4)(ii) and (iii) (1984). Some petitioners contend that the requirement of a confidentiality agreement will deter health professionals from lending assistance. In Part IV(D)(2)(b) above we hold that the restriction on access to health professionals is invalid. But in any event, confidentiality agreements are a well-accepted traditional means of allowing access to trade secret information while effectively protecting the owners of that information from irreparable harm. Thus we reject petitioners' challenge to the Standard's requirement that requesters of trade secret information sign a confidentiality agreement.

### V.

#### Conclusion

The petitions for review are properly filed in this court. The Hazard Communication Standard, to the extent that it is valid, preempts state hazard communication rules as they apply to employees in the manufacturing sector. The Standard may operate in that sector, but the Secretary will be directed to reconsider its application to employees in other sectors, and to order its application in those sectors unless he can state reasons why such application would not be feasible. The Secretary's ejection of the RTECS list as overinclusive is supported by substantial evidence, consistent with the OSH Act's statutory purpose, and is therefore valid. The definition of trade secrets, which is broader than the protection afforded trade secrets by state law, is invalid, and the Secretary will be directed to reconsider a trade secret definition which will not include chemical identity information that is readily discoverable through reverse engineering. The trade secret access rule in the Standard is invalid insofar as it limits access to health professionals, but is otherwise valid, and the Secretary will be directed to adopt a rule permitting access by employees and their collective bargaining representatives.

JAMES McGIRR KELLY, District Judge, concurring and dissenting:

Although I concur with the majority's disposition of most of the issues in this case, I am unable to agree with the majority's position that restricting access to trade secret information to only health care professionals is inconsistent with the requirements of Section 6(b)(5) of the OSH Act, 29 U.S.C. § 655(b)(5), and is not supported by substantial evidence in the record.

Section 6(b)(5) states in pertinent part:

(5) The Secretary, in promulgating standards dealing with toxic materials or harmful physical agents under this subsection, shall set the standard which *most adequately assures, to the extent feasible, on the basis of the best available evidence,* that no employee will suffer material impairment of health or functional capacity even if such employee has regular exposure to the hazard dealt with by such standard for the period of his working life....

29 U.S.C. § 655(b)(5) (emphasis added).

There is no meaningful reason why every employee or his or her agent should be granted the right to obtain trade secret information. The majority, in overruling the Secretary's restriction which requires that trade secret information only be given to health care professionals, opens the door allowing every person in the work place the right to obtain trade secret information if the person signs a confidentiality statement. The majority holds that restricting trade secret information to the health care profession does not meet the standard that "most adequately assures, to the extent feasible, on the basis of the best available evidence, that no employee will suffer material impairment of health ..." 29 U.S.C. § 655(b)(5). I am not in accord with the majority's position which rejected the Secretary's viewpoint, which is that the health care professions can most adequately and professionally advise workers who may be exposed to hazardous chemicals. I see little, if any, benefit to allow any worker or his agent to obtain such confidential information. Moreover, I find that Section 15 of OSH Act, 29 U.S.C. § 664 is a guidepost to caution the Secretary not only when he or she seeks confidential information for any proceeding under the OSH Act, but also when he or she enacts standards to effectuate the intentions of Congress.

Indeed, Congress has made the Secretary a quasifiduciary for owners of trade secrets in that the Secretary, in exercising his or her powers, must be mindful of the interests the possessors of trade secrets have.

Accordingly, I respectfully dissent on this issue. In all other respects I concur with the majority opinion.