**OHIO MANUFACTURERS'**
**ASSOCIATION, et al.,**
**Plaintiffs,**

**v.**

**CITY OF AKRON, et al., Defendants.**

**Civ.A. C 85–3658 A.**

United States District Court,
N.D. Ohio.

Feb. 7, 1986.

**624**

John W. Hoberg, Marcia J. Mengel, Vorys, Sater, Seymour & Pease, Columbus, Ohio, for plaintiffs.

Janice E. Crossland, Asst. Dir. of Law, Akron, Ohio, for defendants.

Paul J. Malesick, Asst. Gen. Counsel, United Rubber, Cork, Linoleum & Plastic Workers of America, Salvatore J. Falletta, Gen. Counsel, International Chemical Workers Union, Akron, Ohio, for amicus curiae.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

This case is before the Court on an expedited basis following the December 5, 1985 issuance of a Temporary Restraining Order enjoining defendants from enforcing Akron, Ohio Codified Ordinances ch. 1830 ("Chapter 1830" or "the Akron ordinance"), entitled "Hazardous and Toxic Substances," on its effective date of December 17, 1985.[1] Plaintiffs are the Ohio Manufacturers' Association, a non-profit membership association representing sixty-one employers in the City of Akron which are classified within Standard Industrial Classification ("SIC") Codes 20 through 39, and Akron Selle Company, an Akron contract metal stamping company employing twenty persons and classified within SIC Code 34.[2] Defendants are the City of Akron; Akron's Health Commission; Akron's Health Department; C. William Kech, M.D., Director of Health; and Harold K. Stubbs, Director of Law. The latter four defendants share responsibility for the enforcement of Chapter 1830. Nine Akron community groups have been permitted to file a brief as *amici curiae*.[3]

The complaint summarizes the plaintiffs' claims:

> The basis for plaintiffs' action is that Chapter 1830 1) violates the Supremacy Clause of the United States Constitution in that it conflicts with and has been preempted by the Occupational Safety and Health Act (hereinafter "OSH Act"), 29 U.S.C. § 651 *et seq.*, and the Hazard

1. The parties agreed to abide by the terms of the temporary restraining order until plaintiffs' motion for a preliminary injunction was resolved by this Court. Subsequently they agreed to consolidate the resolution of the motion with a trial on the merits pursuant to Fed.R.Civ.P. 65(a)(2).

2. SIC Codes 20 through 39 consist primarily of categories of manufacturers as set forth in the Standard Industrial Classification Manual published by the U.S. Office of Management and Budget.

3. The *amici curiae* participating in the brief are the Akron Catholic Commission; the Akron-

Medina County Labor Council, AFL–CIO; Council of Block Club Presidents; International Chemical Workers Union, AFL–CIO; Ohio Public Interest Campaign; Opportunity Parish Ecumenical Neighborhood-Ministry ("OPEN–M"); United Rubber Workers, Local 2 Retirees; United Rubber, Cork, Linoleum & Plastic Workers of America; and Akron Summit Community Action Agency. Many of these organizations were active in the sponsorship, drafting, and review of the Akron Ordinance. All assert that their constituencies will be affected by the resolution of this case. Brief of *Amici Curiae* at 2–6.

Communication Standard promulgated pursuant to the OSH Act, 29 C.F.R. § 1910.1200; 2) violates the Commerce Clause of the United States Constitution in that it constitutes an excessive and undue burden on interstate commerce; and 3) violates Article XVIII, Section 3, of the Ohio Constitution in that certain applications of it conflict with and have been preempted by Ohio Revised Code Section 3745.05(D)(3).

Subsequent to oral argument on January 17, 1986, the parties stipulated a dismissal of the third cause of action. However, plaintiffs still seek a declaration that Chapter 1830 is unconstitutional both on its face, and as applied to certain employers.

Upon consideration, and for the reasons set forth below, the plaintiffs' motion is denied, and judgment is entered for the defendants.

Jurisdiction is based upon 28 U.S.C. § 1331 (1982).

## I.

### A.

Akron's "Right-to-Know" ordinance, No. 771–1984, is designated "Chapter 1830: Hazardous and Toxic Substances." Its preamble indicates that the ordinance was promulgated to protect workers, firefighters, other public officials, and the public against the dangers of toxic substances used in Akron workplaces. Chapter 1830 is applicable to employers within the City of Akron which are categorized by the enumerated Standard Industrial Classification Codes ("employers"). §§ 1830.01, 1830.-03(i). Among explicitly exempted employers and substances are federal, state, and local governments and their units (not including Akron itself), laboratories, goods transported through Akron, consumer products and food intended for consumption by the general public, and *de minimis* amounts of hazardous substances. § 1830.02. The "hazardous chemicals" regulated by the ordinance are designated in a master list to be produced by Akron's Health Commission in accordance with a minimum list established by Chapter 1830. § 1830.05. The Health Commission is appointed administrator and enforcement agent of the ordinance. § 1830.04.

Chapter 1830 requires employers to label each container of hazardous material with its chemical name, any applicable Department of Transportation labels, and cancer and reproductive warnings when appropriate. § 1830.07(a). Placards or signs may replace labels when stationary containers within a work area have the same hazards, or when labels are susceptible to damage. §§ 1830.07(b), (c).

Each employer is mandated to either obtain or create a material safety data sheet ("MSDS") for each hazardous chemical it uses, manufactures or stores. The MSDS for chemicals not classified as trade secrets must report relevant health and safety information, including chemical and common names of ingredients, physical and chemical characteristics, known acute and chronic health effects of exposure, primary routes of entry, permissible exposure limits established by the Occupation Safety and Health Administration ("OSHA"), precautions for safe handling and use, control measures, and emergency and first aid procedures. § 1830.10(a). Employees who request to see an MSDS shall be provided with a copy by their employers by the end of the next weekday following the request. § 1830.10(b). Processors, users or storers of hazardous chemicals who have not been provided with an MSDS by their suppliers or manufacturers must take prescribed steps to procure a copy following an employee request. § 1830.10(d).

Employers governed by Chapter 1830 who manufacture, use, or store hazardous substances must establish workplace training programs for their employees. § 1830.06(b). These programs must explain the hazards of chemicals to which employees are exposed; the employer's method of hazard communication; appropriate work practices and protective measures; and emergency procedures. § 1830.11(a). Employees shall also be informed of their rights to receive informa-

tion on hazardous chemicals in their workplace, to request an inspection of the workplace, and to be free from retaliatory discharge, discipline, or other discrimination for exercising a Chapter 1830 right. §§ 1830.11(b), 1830.15.

Each January, employers subject to the ordinance are required to file a list of all work areas in the workplace which contain hazardous chemicals. § 1830.09(a)(1). Any spill, leak or emission of a toxic substance which must be reported to a federal or state agency pursuant to applicable law must also be reported to Akron's Health Commission designee immediately. § 1830.-09(a)(2).

Temporary variances, subject to renewal, to the labeling provisions of Chapter 1830 may be obtained upon either a showing of undue or unnecessary hardship for a specific employer, workplace, or work area, or for a pre-existing program in substantial compliance. § 1830.08(a). Trade secret protection is also available to employers upon special showing. A specific chemical name of an eligible substance may be withheld if its properties and effects are disclosed upon the MSDS and if it is not a designated carcinogen. § 1830.14(a). However, an employer cannot refuse to provide the specific chemical identity to medical or fire personnel in an emergency, nor to an employee who is regularly exposed to the toxin who agrees to execute a confidentiality agreement. § 1830.14(f), (i). Upon a showing that an employee requesting the chemical identity of a substance for which trade secrecy is claimed is eligible for such information, the Director of Health's designee may subject the employer to citation. § 1830.14(n).

Enforcement of Chapter 1830 is delegated to the Health Department, the Health Commission, and the Law Director of Akron. §§ 1830.12, 1830.13. Compliance with the ordinance was required of employers of fifty-one or more employees within one year of passage, i.e., December 17, 1985, and for employers of fifty or fewer employees, by June 17, 1986. § 1830.17.

B.

Pursuant to his power to promulgate standards provided in § 6 of the Occupational Health and Safety Act of 1970, 29 U.S.C. § 655 (1982) ("OSH Act"), the Secretary of Labor ("Secretary") issued an occupational health and safety standard entitled "Hazard Communication Standard" ("Standard") on November 25, 1983. *See United Steelworkers of America v. Auchter,* 763 F.2d 728, 735 (3d Cir.1985). The stated purpose of the Standard is "to ensure that the hazards of all chemicals produced or imported by chemical manufacturers or importers are evaluated and that information concerning their hazards is transmitted to affected employers and employees within the manufacturing sector." 29 C.F.R. § 1910.1200(a) (1985).[4] The Standard expressly intends "to preempt any state law pertaining to this subject. Any state which desires to assume responsibility in this area may also do so under the provisions of section 18 of the Occupational Safety and Health Act ... which deals with state jurisdiction and state plans." § 1910.1200(b).

The Standard applies to a specified class of employers who are involved in manufacturing using hazardous chemicals. Chemical manufacturers and importers are required to assess the hazards of their products; distributors must transmit relevant information with the products; and employers in SIC Codes 20 through 39 are instructed to provide information about the hazardous chemicals to exposed employees. § 1910.1200(b). Regulation of laboratories is less stringent, § 1910.1200(b)(3), and certain products, such as foods, regulated pesticides, and tobacco products, are partially or entirely exempted from regulation by the Standard. §§ 1910.1200(b)(3)–(5).

Instead of defining which chemicals are "hazardous" by the creation of a master list by OSHA or its designee, the responsibility for making hazard determinations is

---

**4.** Unless otherwise indicated, all regulations contained in the Standard are located in Volume 29 of the Code of Federal Regulations, in the 1985 edition.

delegated to chemical manufacturers and importers. § 1910.1200(d). Employers are expected to make these determinations only if they choose not to rely upon the determinations of the chemical manufacturers or importers. § 1910.1200(d)(1). The Standard enumerates lists of presumptively hazardous chemicals which persons evaluating chemical dangers should consider established as hazardous. § 1910.1200(d)(3). While including some of the same lists of hazardous chemicals as those which the Akron Health Commission is required to review under the Akron ordinance when creating its master list, the Standard's lists are not identical.

The Standard mandates that chemical manufacturers, importers and distributors label hazardous chemicals with the substance's identity, "appropriate" hazard warnings, and their names and addresses. § 1910.1200(f)(1). Employers must label each container of hazardous chemicals in the workplace with the chemical's identity and hazard warnings. § 1910.1200(f)(4).

MSDS requirements are also part of the Standard. The federal regulations require a list of information similar to Akron's ordinance: chemical and common names; physical and chemical character; physical hazards; primary route of entry; OSHA permissible exposure limit; potential carcinogens; generally applicable precautions and controls; and emergency and first aid procedures. § 1910.1200(g)(2). Chemical manufacturers and importers are directed to provide MSDS's to distributors and manufacturing purchasers, § 1910.1200(g)(6), and employers are expected to make them readily accessible to employees during each work shift. § 1910.1200(g)(8).

Employers must develop written communications programs to administer the labeling, MSDS, and employee information and training requirements of the Standard. § 1910.1200(e). Employees must be informed about the availability of this written program, the requirements of the Standard, and the presence of hazardous chemicals in their work area. § 1910.1200(h)(1). Employee training should explain the physical and health hazards, protective measures available to employees, and the details of the hazard communications program. § 1910.1200(h)(2).

Like the Akron ordinance, the Standard makes trade secret protection available when the properties and effects of an eligible chemical are disclosed and the specific chemical identity will be made available to health professionals. § 1910.1200(i). In an emergency, a chemical manufacturer, importer, or employer must immediately disclose the chemical identity to treating health professionals without a written statement of need or an executed confidentiality statement. § 1910.1200(i)(2). In a non-emergency situation, health professionals may only learn the identity of a trade secret by submitting an elaborate written statement and an executed confidentiality agreement. § 1910.1200(i)(3).

The Chemical Hazardous Communication Standard requires chemical manufacturers, importers, and distributors to be in compliance with its provisions by November 25, 1985. Employers in the manufacturing sector must comply by May 25, 1986. § 1910.1200(j).

## II.

Plaintiffs argue that Chapter 1830 is invalid as it applies to employers in SIC Codes 20 through 39, since these employers are covered by the federal standard regulating hazard communication in the workplace.[5] First, they assert that Akron's ordinance is expressly preempted by 29 U.S.C. § 667 (1982) and 29 C.F.R. § 1910.-1200(b) (1985). Alternatively, they argue that Chapter 1830 is impliedly preempted by the goals of the OSH Act and the Standard, by Chapter 1830's "true regulatory intent," and by a conflict between the two regulations. On consideration, and for the reasons set forth below, this Court cannot agree that Chapter 1830 is expressly

---

**5.** Plaintiffs clearly are not challenging the applicability of Chapter 1830 to employers in other SIC Codes. Plaintiffs' Brief in Support of Temporary Restraining Order at 20.

preempted, and it does not find that any portion of the ordinance is impliedly preempted.

A. *Standards for Federal Preemption of States' Regulatory Power*

The Supremacy Clause of the United States Constitution provides:

This Constitution, and the Laws of the United States which shall be made in pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; the Judges in every State shall be bound thereby, anything in the Constitution or Laws of any State to the contrary notwithstanding.

U.S. Const., art. VI, cl. 2. Under the preemption analysis derived from the Supremacy Clause, "[t]he purpose of Congress is the ultimate touchstone." *Metropolitan Life Insurance Co. v. Massachusetts,* — U.S. ——, ——, 105 S.Ct. 2380, 2393, 85 L.Ed.2d 728 (1985) (quoting *Malone v. White Motor Corp.,* 435 U.S. 497, 504, 98 S.Ct. 1185, 1190, 55 L.Ed.2d 443 (1978)).

■ "Pre-emption may be either express or implied, and 'is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" *Fidelity Federal Savings & Loan Association v. de la Cuesta,* 458 U.S. 141, 152–153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982) (quoting *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977)). Federal regulations are entitled to the same preemptive effect enjoyed by federal statutes. *Fidelity Federal,* 458 U.S. at 153–54, 102 S.Ct. at 3022–23.

■ Implied preemption is implicated when there is an "actual conflict" between state and federal law.

Such a conflict arises when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–143, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963), or when state law

"stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz,* [312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)]. *See generally Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, ——, 104 S.Ct. 2694, ——, 81 L.Ed.2d 580 (1984).

*Hillsborough County, Florida v. Automated Medical Laboratories, Inc.,* — U.S. ——, ——, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985). *See also L.P. Acquisition Co. v. Tyson,* 772 F.2d 201, 207 (6th Cir.1985).

■ Traditionally states have been permitted considerable latitude to regulate public health and safety pursuant to their police power. *Metropolitan Life Insurance,* — U.S. at ——, 105 S.Ct. at 2398. To strike down a state's health and safety regulation, Congress' intent must be clearly manifested. *Southern Pacific Co. v. State of Arizona,* 325 U.S. 761, 766, 65 S.Ct. 1515, 1518, 89 L.Ed. 1915 (1945); *see Jones,* 430 U.S. at 525, 97 S.Ct. at 1309.

B. *Express Preemption by the OSH Act*

■ Plaintiffs rest their argument that Chapter 1830 is expressly preempted upon § 18 of the OSH Act, 29 U.S.C. § 667 (1982) ("§ 18"), which provides:

(a) Nothing in this chapter shall prevent any State agency or court from asserting jurisdiction under State law over any occupational safety or health issue with respect to which no standard is in effect under Section 655 of this title.

(b) Any State which, at any time, desires to assume responsibility for development and enforcement therein of occupational safety and health standards relating to any occupational safety or health issue with respect to which a Federal standard has been promulgated under section 655 of this title shall submit a State plan for the development of such standards and their enforcement.

The Secretary of Labor shall approve a state plan submitted pursuant to § 18(b)

which meets the conditions listed in § 18(c). 29 U.S.C. § 667(c)(1982).

Plaintiffs argue that because the Standard regulates the area of chemical hazard communication and because Akron has not had, and cannot have, its ordinance approved by the Secretary, Akron is precluded from using Chapter 1830 to regulate such matters. They buttress their contention by citing the Secretary's regulations interpreting § 18. Title 29 C.F.R. § 1901.2 (1985) provides in relevant part:

> Section 18(a) of the Act is read as preventing any State agency or court from asserting jurisdiction under State law over any occupational safety or health issue with respect to which a Federal standard has been issued under section 6 of the Act.

The Standard itself indicates its preemptive effect:

> This occupational safety and health standard is intended to address comprehensively the issue of evaluating and communicating chemical hazards to employees in the manufacturing section, and to prevent any state law pertaining to this subject. Any state which desires to assume responsibility in this area may only do so under the provisions of section 18 of the Occupational Safety and Health Act (29 U.S.C. 651 *et seq.*) which deals with state jurisdiction and state plans.

29 C.F.R. § 1910.1200(a)(2) (1985) ("§ 1910.-1200(a)(2)").

The courts which have considered the preemption of state right-to-know acts by the Hazard Communication Standard have held that these state statutes are preempted as applied to employers in SIC Codes 20 through 39 on matters of workplace safety dealt with in the Standard. *Auchter,* 763 F.2d at 736, *cited in New Jersey State Chamber of Commerce v. Hughey,* 774 F.2d 587, 593 (3d Cir.1985) (New Jersey Right-to-Know Act); *Manufacturers Association of Tri-County v. Knepper,* 623 F.Supp. 1066 (M.D.Pa.1985) (Pennsylvania Right-to-Know Act). Defendants, however, distinguish these cases as involving state, rather than municipal, right-to-know statutes.

Defendants' contention is that the word "state" as it is used in the preemption provisions of the OSH Act and the Secretary's regulations excludes political subdivisions such as the City of Akron. They rely upon the definition of "State" set forth in 29 U.S.C. § 652(7) (1982):

> The term "State" includes a State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, American Samoa, Guam, and the Trust Territory of the Pacific Islands.

The failure to include political subdivisions within this definition, the defendants argue, means that Congress did not intend to preempt municipalities in § 18. The legislative history, however, demonstrates that the definition of "state" was not drafted with the intent of exempting political subdivisions from preemption. When introducing this definition as an amendment, Senator Javits of New York stated:

> Mr. President, the *sole purpose* of this amendment is to make eligible to file what is called a State plan those territories and possessions of the United States which are spelled out in the amendment. This matter is not otherwise defined in the bill.

Subcomm. on Labor of the Sen. Comm. on Labor and Public Welfare, 92d Cong., 1st Sess., *Legislative History of the Occupational Health and Safety Act of 1970,* at 504 (1971) (emphasis added). Given Senator Javits' purpose for defining "state", the definition obviously does not reflect at all upon Congress' willingness or unwillingness to preempt municipal ordinances.

Nevertheless, the absence of language regarding the preemption of laws of political subdivisions in the OSH Act is remarkable. As defendants point out, Congress has explicitly included political subdivisions in other provisions of the OSH Act. 29 U.S.C. § 655(b)(1) (1982) (Secretary may promulgate standards based upon information submitted by a political subdivision); 29 U.S.C. § 667(c)(6) (1982) (an approved state plan must assure the Secretary that

the state will establish an occupational safety and health program protecting employees of political subdivisions); 29 U.S.C. § 673(b)(2) (1982) (Secretary may make grants to political subdivisions for development and administration of statistical programs). Furthermore, countless federal regulatory statutes contain preemption provisions which explicitly include political subdivisions. *See, e.g.,* Clean Air Act Amendments of 1977, 42 U.S.C. § 7543 (1982); Medical Device Amendments of 1976, 21 U.S.C. § 360k (1982); Poison Prevention Packaging Act, 15 U.S.C. § 1476 (1982); Lead-Based Paint Poison Prevention Act, 42 U.S.C. § 4846 (1982); Motor Vehicle Information and Cost Savings Act, 15 U.S.C. § 1920(a) (1982); Egg Products Inspection Act, 21 U.S.C. § 1052(a) (1982); Consumer Products Safety Act, 15 U.S.C. § 2075 (1982); Flammable Fabrics Act, 15 U.S.C. § 1203 (1982).[6] Congress' practice of explicitly preempting political subdivisions, then, militates against the inferences that Congress either forgot to include political subdivisions in § 18 or implicitly included them in the word "state".[7]

The purposes of the OSH Act also support the conclusion that § 18 does not include political subdivisions. The statute provides:

The Congress declares it to be its purpose and policy, through the exercise of its powers to regulate commerce among the several States and with foreign nations and to provide for the general welfare, to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources....

29 U.S.C. § 651(b) (1982). This overriding purpose of the OSH Act is exhaustively documented. *See, e.g.,* S.Rep. No. 1282, 91st Cong., 2d Sess., *reprinted in U.S. Code Cong. & Ad.News* 5117 (1970); McClintock, *Foreword,* and Meeds, *A Legislative History of OSHA,* 9 Gonz.L.Rev. 317, 327 (1974).

Plaintiffs argue, however, that another important goal of the OSH Act was "to establish healthy work environments in a uniform way with minimum burden on interstate commerce." Plaintiffs' Brief in Support of Temporary Restraining Order at 22. The Third Circuit Court of Appeals has acknowledged that a desire to reduce regulatory burdens is apparent in the Standard, but it concluded:

That purpose is arguably at odds with congressional intention that the OSH Act provide a federal floor for safety in the workplace. Reduction of burdens posed by multiple state laws does not appear to have been a significant congressional concern; rather, Congress favored a uniform federal law so that those states providing vigorous protection would not

6. In their brief, plaintiffs cite *Rollins Environmental Services, Inc. v. Parish of Saint James,* 775 F.2d 627 (5th Cir.1985), and *Warren County v. State of North Carolina,* 528 F.Supp. 276 (E.D.N.C.1981), for the proposition that federal regulations preempting state law also preempt the laws of political subdivisions. Defendants correctly respond that these cases interpreted § 18 of the Toxic Substance Control Act, 15 U.S.C. § 2617(a)(2)(B) (1982), which specifically preempts laws of a "State or political subdivision of a State."

7. The absence of discussion of the preemption of the laws of political subdivision in the 1277-page legislative history of the OSH Act also undermines the assertion that Congress meant to expressly include political subdivisions in the preemption provision.

At oral argument, plaintiffs proffered the Privileges and Immunities Clause of the Four-teenth Amendment to the United States Constitution as an example of language which has been interpreted to apply to localities as well as states, although words denoting political subdivisions do not appear in the text. Plaintiffs might just as aptly point out that the First Amendment applies to the states, although it purports to limit the activities of Congress. These examples of constitutional interpretation are inapposite to determine whether "Congress' command is explicitly stated in the statute's language." *Jones,* 430 U.S. at 525, 97 S.Ct. at 1309. Plaintiffs' argument, in the words of defendants' counsel, "asks the Court to find express what is not express." The doctrine of express preemption by its terms requires strict construction, rather than the expansive construction routinely applied to constitutional provisions.

be disadvantaged by those that did not. Subcomm. on Labor of the Sen. Comm. on Labor and Public Welfare, 92d Cong., 1st Sess., Legislative History of the Occupational Safety and Health Act of 1970, Pub.L. No. 91–596, at 144, 413, 444 (1971).

*Auchter,* 763 F.2d at 734. *See also Hughey,* 774 F.2d at 593. This viewpoint is shared by at least one commentator, who dismissed the argument that the OSH Act intended to minimize regulatory burdens:

> Inconvenience to employers is an invalid objection, because Congress did not intent to protect employers' convenience. If it had, Congress would have preempted all state standards.

Foote, *Administrative Preemption: An Experiment in Regulatory Federalism,* 70 Va.L.Rev. 1429, 1431, 1457–1458 (1984).

In a different context, the Supreme Court has ruled that the OSH Act's purpose was to provide protection to workers, despite high costs to business. In *American Textile Manufacturers Institute v. Donovan,* 452 U.S. 490, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981), the Court construed § 6(b)(5) of the OSH Act, which provides in pertinent part:

> The Secretary, in promulgating standards dealing with toxic materials or harmful physical agents under this subsection, shall set the standard which most adequately assures, to the extent feasible, on the basis of the best available evidence, that no employee will suffer material impairment of health or functional capacity even if such employee has regular exposure to the hazard dealt with by such standard for the period of his working life....

29 U.S.C. § 655(b)(5) (1982). In order to reach its holding that this provision required the Secretary to conduct a feasibility analysis rather than a cost-benefit analysis, the Court found that Congress placed "the 'benefit' of worker health

above all other considerations save those making attainment of this 'benefit' unachievable." *Id.* at 509, 101 S.Ct. at 2490. This holding was mandated by the Court's lengthy and painstaking review of the legislative history of the OSH Act:

> The congressional Reports and debates certainly confirm that Congress meant "feasible" and nothing else in using that term. Congress was concerned that the Act might be thought to require achievement of absolute safety, an impossible standard, and therefore insisted that health and safety goals be capable of economic and technological accomplishment. Perhaps most telling is the absence of any indication whatsoever that Congress intended OSHA to conduct its own cost-benefit analysis before promulgating a toxic material or harmful physical agent standard. *The legislative history demonstrates conclusively that Congress was fully aware that the Act would impose real and substantial costs of compliance on industry, and believed that such costs were part of the cost of doing business.*

*Id.* at 514, 101 S.Ct. at 2493 (emphasis added). The Court concluded, "When Congress passed the Occuptional Safety and Health Act in 1970, it chose to place preeminent value on assuring employees a safe and healthful working environment, limited only by the feasibility of achieving such an environment." *Id.* at 540, 101 S.Ct. at 2506.[8]

The conclusion that worker safety, rather than a concern about regulatory burden created by inconsistency, motivated Congress to pass the OSH Act is substantially supported by legislative history, academic commentary, and the OSH Act itself. Section 18 of the OSH Act sets a federal floor on occupational health and safety that covers every state and territory of this country. With the floor established, states are free to enact more stringent requirements via a § 18(c) approved plan. *See* 29 U.S.C.

---

**8.** The Supreme Court's construction of the OSH Act in *Donovan* is similar to the method used by this Court. The Supreme Court contrasted other federal statutes explicitly requiring cost benefit analysis, *id* at 510–11, 101 S.Ct. at 2491–92, and it analyzed the policy of the OSH Act to reach the decision that the word "feasible" should be strictly construed.

667(c)(2) (1982) (standards promulgated under approved state plan must be "at least as effective in providing safe healthful employment and places of employment as the standards promulgated under section 655...."). A municipality's freedom to also promulgate higher standards would not undercut that floor, but would support the policy of creating safer workplaces.[9]

Plaintiffs advance numerous unpersuasive reasons for not interpreting Congress' purpose as one of providing a "federal floor". They argue that legislative history demonstrates that Congress rejected the idea that the OSH Act should operate as a floor, apparently relying upon the following statement:

Both versions of the bill allowed agreements between the Secretary and a State whereby the State could continue enforcement of its health and safety standards pending final action on the State plan. The Senate bill limited such agreements to standards which were not in conflict with Federal standards. The Senate bill also provided that a State standard which was more stringent than a Federal standard was not to be regarded as one in conflict with that Federal standard. The Senate receded.

S.Rep. No. 1282, 91st Cong., 2d Sess., *reprinted in U.S.Code Cong. & Ad.News*, at 5238 (1970). However, this Court cannot agree that Congress' failure to adopt the Senate's bill indicates an over-riding interest in uniformity, particularly in light of its willingness to permit states to enforce their own more stringent rules after the Secretary has approved their programs pursuant to § 18(b).

Second, plaintiffs argue that if the OSH Act were intended to provide only minimum protections for workers, there would be no reason for Congress to include § 18, since the OSH Act itself would accomplish that goal in the absence of state participation. The legislative history shows, however, that Congress intended to shift the enforcement of occupational health and safety regulations to the states, and that it promulgated § 18 with that intention:

As an encouragement for State action, the bill provides Federal financial support to assist the States in assuming their own programs for worker health and safety. Planning grants with up to 90 percent Federal participation, and program grants with up to 50 percent Federal participation are provided.

The 90 percent grant is designed to aid the States in identifying needs, developing State plans and programs for collecting statistical data, increasing personnel capabilities, and improving administration and enforcement. The 50 percent Federal grant is made available to assist States in carrying out the occupational safety and health programs contained in their plans, as well as programs concerning occupational safety and health statistics.

S.Rep. No. 1282, 91st Cong., 2d Sess., *reprinted in U.S.Code Cong. & Ad.News*, at 5195 (1970). Moreover, an appellate court construing § 18 observed:

In the application of a new federal statute, there is a likely Congressional contemplation of maximizing use of existing state machinery. "Federalism" cannot be invoked categorically where it would defeat the national objective. A sensitivity to state participation has value, however, where the state administration can be integrated with federal application—either as a supplement, or as a stopgap measure, or as a delegation under federal control.

*American Federation of Labor and Congress of Industrial Organizations, Industrial Union Department v. Marshall*, 570 F.2d 1030, 1037 (D.C.Cir.1978). Given the obvious rationale for § 18, plaintiffs' contention that there would be no purpose for § 18 if the OSH Act meant to provide minimum, rather than uniform, standards is wholly untenable.

---

**9.** Less stringent municipal standards would be impliedly preempted, since they would act as an obstacle to Congressional policy. *See* discussion of standards for implied preemption, *supra* at 628.

Third, plaintiffs cite the remarks of several senators in the legislative history for the proposition that uniformity was an intent when they wrote the OSH Act. The Court is not persuaded that these few statements of individual debaters indicate that the OSH Act has the subsidiary purpose plaintiffs attribute to it. Furthermore, the Court is not convinced that all of the statements refer to the unfairness of regulatory burden on employers rather than the unfairness that "efforts of the more vigorous states are inevitably undermined by the shortsightedness of others." S.Rep. No. 1282, 91st Cong., 2d Sess., *reprinted in U.S.Code Cong. & Ad.News*, at 5180 (1970).

Finally, plaintiffs rely on *Township of Greenwich v. Mobil Oil Corp.*, 504 F.Supp. 1275 (D.N.J.1981), in which the court held that the township's right to enforce its zoning ordinance and building code was not preempted by the OSH Act. En route to its decision that preemption of those ordinances would be contrary to Congressional intent as evidenced in the legislative history, the court stated, "We agree that if plaintiff Township sought, through the issuance of Notices of Violation, to control the working areas of defendant Mobil's refinery, plaintiff's attempt to regulate would be preempted by the Occupational Safety and Health Act." This remark was unnecessary to the resolution of the *Greenwich* case, and this Court doubts that the issue was subjected to the exhaustive briefing and argument afforded in this case. The Court, therefore, is unpersuaded by the dictum of the New Jersey district court.

Plaintiffs also cite a multitude of cases holding that preemptions of state law are to be broadly construed in order to give life to the Supremacy Clause. However, this argument ignores the fact that express preemption, by definition, must be clearly manifested, especially when local health and safety provisions are endangered. *Jones*, 430 U.S. at 525, 97 S.Ct. at 1309. When § 18 of the OSH Act is construed in light of its motivating purpose—worker safety—and in comparison to other federal

preemptory provisions which routinely preempt the laws of political subdivisions in explicit terms, this Court cannot conclude that Congress' intent to preempt laws such as Chapter 1830 is "clearly manifested." Accordingly, this Court holds that § 18 does not expressly preempt Akron's ordinance, which regulates matters already regulated in OSHA's standard.

### C. *Express Preemption by the Standard*

■ Plaintiffs urge that in the event this Court finds that the Akron ordinance is not expressly preempted by § 18 of the OSH Act, it should construe § 1910.1200(a)(2) of the Standard as expressly preempting Chapter 1830 by virtue of OSHA's language reported in the Federal Register and the Congressional Record. This Court does not agree that interpretive language which is not part of the regulation accords the Standard preemptive effect over political subdivisions. Moreover, even if such language could be construed to mean that the regulations were intended by OSHA to have preemptive effect over municipalities, this Court would not accept such an interpretation because of its obvious inconsistency with the clear Congressional policy in the OSH Act.

1.

To support its position that OSHA expressly preempts laws of political subdivisions despite § 1910.1200(a)(2)'s failure to explicitly mention them, plaintiffs rely heavily upon OSHA's preambles to interim and final drafts of the Standard. In particular, they cite OSHA's language explaining the purposes of the Standard, which explicitly states policies of uniformity. In the preamble to its regulations, OSHA states that its purpose was "to establish uniform requirements for hazard communication in one segment of industry, the manufacturing division." 48 Fed.Reg. 53281 (1983). Various statements throughout the report echo the rationale that "the promulgation of a cost-effective federal standard is likely to reduce the cost of complying with the

various state and local right-to-know laws." 48 Fed.Reg. 53329 (1983). Plaintiffs identify "OSHA's strongest expression of preemptive effect" as its explanation of the preemption language in its summary of the Standard as promulgated:

This preemption will serve to reduce the burden on interstate commerce produced by conflicting state and local regulations and will insure that all employees in the manufacturing sector are accorded the same degree of protection. OSHA will examine carefully any state requests to regulate in this area to determine any potentially burdensome impact on interstate commerce as well as to ascertain whether there is a compelling need for separate regulation.

48 Fed.Reg. 53334 (1983).

Plaintiffs also rely upon two cases in which the Supreme Court evaluated language in preambles to regulations to decide what preemptive effect the regulations had. In *Fidelity Federal,* 458 U.S. at 141, 102 S.Ct. at 3016–17, the Court looked at the preamble accompanying a regulation promulgated by the Federal Home Loan Bank Board to resolve "any ambiguity in [the regulation's] language...." In *Hillsborough County, Florida,* — U.S. at ——, 105 S.Ct. at 2371, the Court evaluated language in the preamble of regulations promulgated by the Food and Drug Administration to determine that local regulation of the collection of blood plasma was not intended to be preempted by the agency.

However, the Supreme Court had earlier held that giving administrative language which was not within the body of the regulations the same effect as if it were part of the regulations violates the Administrative Procedure Act, 5 U.S.C. §§ 551–559. *Chrysler Corp. v. Brown,* 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979). When asked to interpret the phrase "authorized by law" in § 7(b) of the Trade Secrets Act, 18 U.S.C. § 1905 ("§ 7(b)"), the Court refused to read "interpretive regulation or general statement of agency policy" as authorization for purposes of § 7(b). *Id.* at 315–16, 99 S.Ct. at 1724–25. It distin-

guished interpretive language from the substantive portions of regulations, since "such regulations are not properly promulgated as substantive rules, and therefore not the product of procedures which Congress prescribed as necessary prerequisites to giving a regulation the binding effect of law." *Id.* at 315, 99 S.Ct. at 1724 (footnote omitted). Thus, the Court found that the failure to subject interpretive language of the agency to public scrutiny during rulemaking as required by 5 U.S.C. § 553(b) precluded reliance on this language.

In light of *Brown,* the cases relied upon by plaintiffs are distinguishable. The Court in *Fidelity Federal,* 458 U.S. at 158, n. 13, 102 S.Ct. at 3025, n. 13, recognizes the continued vitality of *Chrysler Corp.:*

Citing *Chrysler Corp. v. Brown,* 441 U.S. 281, 315–316 [99 S.Ct. 1705, 1724–25, 60 L.Ed.2d 208] (1979), appellees characterize the preamble as an interpretative regulation that does not have the binding force of law and therefore cannot preempt state law. But *Chrysler Corp.* is not on point because we conclude that § 545.8–3(f) itself supersedes contrary state due-on-sale law; we look to the preamble only for the administrative construction of the regulation, to which "deference is ... clearly in order." *Udall v. Tallman,* 380 U.S. 1, 16 [85 S.Ct. 792, 801, 13 L.Ed.2d 616] (1965). We need not consider, therefore, the preemptive effect of the preamble standing alone.

In the present case, the plain words of § 1910.1200(a)(2), without considering the preamble, will not support an inference that the Standard has a larger preemptive effect than § 18 of the OSH Act. In effect, the plaintiffs urge this Court to construe the Standard to preempt the laws of political subdivisions because of OSHA's interpretation and analysis of its regulations—precisely the case distinguished by the Court in *Fidelity Federal.*

Furthermore, plaintiffs' citation to *Hillsborough* is also inapposite. *Hillsborough* did not involve the interpretation of an ostensibly "expressly" preemptive regula-

tion; instead, it looked to the interpretive language of an agency to determine whether its comprehensive regulation of the field was intended to preempt all state and local regulation:

> Moreover, because agencies normally address problems in a detailed manner and can speak through a variety of means, including regulations, preambles, interpretive statements, and responses to comments, we can expect that they will make their intentions clear if they intend for their regulations to be exclusive. Thus, if an agency does not speak to the question of pre-emption, we will pause before saying that the mere volume and complexity of its regulations indicate that the agency did in fact intend to pre-empt.

—— U.S. at ——, 105 S.Ct. at 2377. Determining whether a regulatory scheme is so exhaustive that it is meant to preempt state or local regulation in its field of law is an inexact science at best. Reliance on interpretive statements by the agency is justified by the nature of the analysis. Deciding whether preemption is express is, by its terms, a much narrower inquiry. Thus, *Hillsborough* does not require the conclusion that an agency's preamble to regulations can be read in conjunction with its preemption provision to find that the regulations expressly preempt local law.

*Chrysler Corp.*, then, prohibits this Court from construing § 1910.1200(a)(2) by reading OSHA's preambles into the Standard. Plaintiffs have failed to demonstrate that *Chrysler Corp.* has been eroded, or that express preemption may be found by reading language outside the text of the regulations.

2.

■ Even if this Court could construe the Standard as expressly preempting the laws of political subdivisions such as Chapter 1830, it would not agree that OSHA was within its authority when assigning the Standard such a preemptive effect. It is true that a preemptive regulation's force does not depend upon express Congression-

al authorization to replace state law. *Fidelity Federal*, 458 U.S. at 154, 102 S.Ct. at 3023. However, when reviewing OSHA's construction of the OSH Act, this Court must first consider whether Congress has already directly addressed this issue. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, ——, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694, *reh'g denied*, —— U.S. ——, 105 S.Ct. 28–29, 82 L.Ed.2d 921 (1984). The judiciary, rather than the agency, is the final interpreter of statutory meaning, and it must reject administrative interpretations which are contrary to clear Congressional intent. *Id.* at 2782, n. 9. If a court, employing traditional tools of statutory construction, decides that Congress had an intent regarding a specific issue, that intention must be given effect. *Id.*

In the present case, this Court has reviewed the structure, provisions, and legislative history of the OSH Act before concluding that Congress intended that the law of political subdivisions should not be expressly preempted. OSHA's contrary interpretation, then, is not afforded the deference due when it is filling interstices created by Congress. Since OSHA's attempt to extend the preemptive effect of its regulations to localities, which are not expressly preempted by § 18 of the OSH Act, contradicts Congress' intent as construed by this Court, the regulations cannot operate to expressly preempt Chapter 1830.

Courts have consistently refused to abrogate the clear intent of Congress, even where the rejection of an agency's actions or construction of the statute would prove very troublesome and costly. In the celebrated "snail darter case," *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), the Supreme Court was urged to prohibit the completion and operation of the Tellico Dam in Tennessee because of the threat to the existence of a species of three-inch fish

known as snail darters, which were protected by the Endangered Species Act of 1973, 16 U.S.C. §§ 1531–1543. Although Congress had already expended more than $100 million on the nearly-built dam, the Court enjoined its completion. In doing so, it relied upon the plain terms of the statutory provision. *Id.* at 173, 98 S.Ct. at 2291. Although the Court's majority did not believe that it was necessary to look at the legislative history of the Endangered Species Act since the statute was plain and unambiguous on its face, *id.* at 184, n. 29, 98 S.Ct. at 2296–97, n. 29, it stated:

> While there is no discussion in the legislative history of precisely this problem, the totality of congressional action makes it abundantly clear that the result we reach today is wholly in accord with both the words of the statute and the intent of Congress. The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost. This is reflected not only in the stated policies of the Act, but in literally every section of the statute.

*Id.* at 184, 98 S.Ct. at 2296–97.

As the Supreme Court in *Hill* did, this Court must enforce the decisions made by Congress when the OSH Act was promulgated over fifteen years ago. Congress clearly intended in the OSH Act to further the policies of worker health and safety, not to reduce the administrative burden on business caused by a lack of uniformity. Both the legislative history and the plain words of the statute compel the conclusion that Congress did not intend to expressly preempt laws of municipalities. Thus, this Court must hold that § 1910.1200(a)(2) of the Standard does not expressly preempt Chapter 1830.

**10.** The following provisions either are uncontested by plaintiffs or raise no plausible preemption issue:

1830.01 Application
1830.03(a)–(h), (j), (l)–(o)
    Definitions
1830.04 Powers and Duties of the Commission

### D. *Implied Preemption*

■ Since Chapter 1830 is not expressly preempted by the OSH Act, each disputed provision[10] of the Akron ordinance must be analyzed in light of the federal regulations to determine whether Chapter 1830 produces an "actual conflict," making compliance a "physical impossibility," or frustrates the federal policy of the OSH Act. *Hillsborough,* —— U.S. at ——, 105 S.Ct. at 2375. The unlikelihood of making either finding when evaluating a local regulatory standard which is more stringent than corresponding federal regulations was noted by the Third Circuit in its review of the New Jersey Right-to-Know legislation. *Auchter,* 763 F.2d at 734. Moreover, the Supreme Court has observed the incongruity of "prevent[ing] States from taking supplementary efforts" towards Congressional goals, thus "interpret[ing] federal statutes to negate their own stated purposes." *New York State Department of Social Services v. Dublino,* 413 U.S. 405, 419–420, 93 S.Ct. 2507, 2516, 37 L.Ed.2d 688 (1973).

### 1) *Exemptions*

Plaintiffs submit that some of the employers and substances exempted by § 1830.02 from regulation under the Akron ordinance are only exempted from labeling requirements under the Standard. In addition, some substances exempted by the Standard are regulated by Chapter 1830. Complaint at ¶ 24. This discrepancy does not, however, make compliance a "physical impossibility." The OSH Act, rather than Akron, creates the federal floor on hazard communications by promulgation of the Hazard Communication Standard, so it is not necessary for Chapter 1830 to regulate all potentially hazardous substances. Further, since § 18(a) of the OSH Act reveals Congress' intention to permit states to fill interstices in federal law, Akron's regula-

1830.06 Hazard Determination and Communication Program
1830.08 Variances
1830.16 Sunset Provision
1830.18 Conflict and Invalidity
1830.19 Separability
1830.20 Penalties

tion of substances exempted by the Standard does not frustrate the federal policy of the OSH Act, but rather contributes to the goal of worker safety.[11]

### 2) Application to "Employers"

The term "employer," characterizing the persons and entities to which Chapter 1830 is made applicable by § 1830.01, is defined as "the City of Akron and any person, firm, corporation, partnership, association or other entity in the City of Akron which is in any of the following Standard Industrial Codes (SIC): 7, 13 through 17, 20 through 39, 41, 42, 45, 48 through 50, 53, 54, 55, 70, 72, 516, 517, 7333, 7342, 7349, 75, 80, 863." § 1830.03(i). As discussed above, this classification results in the application of Chapter 1830 to a much broader group of employers than the Standard, which is limited to the manufacturing sector. It is indisputable that this expansion of employers subject to hazard communication laws is valid.[12] *Hughey*, 774 F.2d at 593; *Knepper*, at 1071.

### 3) Determination of "Hazardous Chemicals"

The "hazardous chemicals" which will be regulated by Chapter 1830 are defined as those contained on a list promulgated by the Health Commission pursuant to § 1830.05. § 1830.03(k). This "Master List of Hazardous Chemicals" ("Master List") shall include chemicals on lists developed by various governmental and research groups identifying hazardous substances, and the Commission is entitled to recommend revisions to the list. § 1830.05. In contrast, substances regulated by the Standard are to be determined by chemical manufacturers and importers in accordance with the procedure set forth in § 1910.-1200(d). These different methods of determining which substances are toxic will probably result in different chemicals being regulated by the Standard and Chapter 1830. Nevertheless, Chapter 1830's list will not "conflict" with those chemicals requiring warnings under the Standard, but merely supplement them. *Hughey*, 774 F.2d at 594.

### 4) Labeling and Placards

Section 1830.07 mandates that each container of hazardous chemicals be labeled, or in some situations marked with a sign or placard, with its chemical name, Department of Transportation required labels, and cancer and reproductive warnings when applicable. Section 1910.1200 of the Standard requires that each container leaving a chemical manufacturer, importer, or distributor be labeled with the chemical's identity, "appropriate hazard warning" and the company's name and address. Employers are responsible for ensuring the labeling of the first two requirements. The Akron and federal provisions do not appear to be at all inconsistent. The Standard specifically requires labeling consistent with Department of Transportation regulations. § 1910.-1200(f)(2). Furthermore, "appropriate hazard warnings" must include information on carcinogenic and reproductive risks, since such characteristics require a finding that a substance is a "hazardous chemical" under the Standard. § 1910.1200(c). There does not appear to be an actual conflict between these labeling provisions. *See Hughey*, 774 F.2d at 595–96; *Knepper*, at 1073–74 (both cases holding that labeling

---

**11.** This Court has accepted the premise that worker health and safety, rather than the alleviation of regulatory burdens on employers, is the policy animating the OSH Act. *See supra* at 630–632. Since any more stringent provision of the Akron ordinance will generally foster that goal, the Court will not repetitively announce that most of the provisions do not frustrate the policy of the OSH Act. Rather, consistency with federal policy will be discussed in the text only when there is a plausible argument to be weighed.

**12.** The Third Circuit has ordered the Secretary to consider applying the Standard to other SIC Codes and to order its application if he cannot advance reasons why that is not feasible. *Auchter*, 763 F.2d at 739. Since municipalities are not expressly preempted by § 18, however, such an expanded application of the Standard would have little, if any, effect on the validity of Akron's ordinance.

requirements of a state law are not preempted by federal law except as applied to the manufacturing sector).

. Plaintiffs argue, however, that the Standard's provision establishing responsibility for compiling MSDS's and its effective dates make compliance with the labeling requirement impossible for the employers for whom Chapter 1830 was scheduled to become effective in December, 1985. The Standard provides that MSDS's shall be produced by chemical manufacturers and importers and provided to distributors and manufacturing purchasers. § 1910.-1200(g)(6). The Standard became effective in November, 1985 for the manufacturers and importers, and it will not become applicable to "downstream" employers until May 25, 1986. Plaintiffs assert that this six-month period between effective dates was designed to permit the downstream employers to have ample time to receive the information from their suppliers. They argue that this information may not yet be available to employers for whom Chapter 1830 was scheduled to become effective in December, 1985. Defendants cogently respond that there are other avenues for employers to obtain information needed to comply with Chapter 1830's labeling requirements, such as requesting chemical names for substances found on the Master List from the International Union of Pure and Applied Chemistry or the Chemical Abstract Service. Moreover, there is apparently no relation whatsoever between the effective date of the Akron ordinance and the date on which the Standard would be applied. Chapter 1830 was not scheduled to become effective as to any employer until one year after its enactment. § 1830.17. Certainly this passage of time should have been ample for large employers to gather the information which they needed for compliance. The Court does not agree that the need to independently take steps to obtain information which would later become available through the operation of the Standard makes compliance with the two regulations "physically impossible."[13]

Plaintiffs wishing to contend that the labeling requirements will "confuse" workers who are bombarded with a myriad of information, must present evidence on this factual issue. *Hughey*, 774 F.2d at 596. Plaintiffs here have not done so. Accordingly, the labeling requirements of Chapter 1830 are not preempted by the Standard.

5) *Employer Filing and Reporting Requirements*

Section 1830.09 contains provisions compelling the filing of reports annually and after spillage or leakage of a hazardous chemical. Employers must also file certain construction or operating permits and pay an annual filing fee. These filings are made available to the fire department pursuant to § 1830.12(g). There are no comparable provisions within the Standard, so there are no actual conflicts. Moreover, since these reports can be utilized for providing information to fire and other public officials, § 1830.09 may be construed as a regulation protecting environmental, rather than workplace, health and safety.[14] A

13. The Court also rejects plaintiffs' assertion that the labeling provision of Chapter 1830 frustrates the policy of the federal law by placing onerous costs upon employers who must comply with additional labeling requirements. Worker safety is the goal which the OSH Act fostered; administrative ease is not.

14. Notwithstanding plaintiffs' characterization of the purpose of these provisions, many of these regulations protect the community as well as workers. The regularity of chemical spills and fires which destroy large areas or cause many illnesses is consistently documented by the media. Moreover, Frank Slayton of the Akron Health Department testified that the in-

formation collected pursuant to Chapter 1830 will be used to trace latent diseases; for zoning purposes (to regulate the proximity of toxic chemicals to population areas, schools, and nurseries); and to avoid contamination of the environment. Captain Charles Strum of the Akron Fire Department testified that Chapter 1830's labeling requirements would help firefighters to identify chemicals on sight and to know the location of hazardous chemicals before going to the scene of a fire. Captain Strum's affidavit confirms that such information would protect firefighters' safety and permit them to make informed evaluations about danger to the community. *But see Hughey*, 774 F.2d at 595 (recog-

funding provision similar to that in the Akron ordinance was specifically upheld by the Third Circuit Court of Appeals because it did not "interfere with compliance with the OSH Act or impose obstacles to the accomplishment of the OSH Act's purposes." *Hughey,* 774 F.2d at 595.

### 6) *Material Safety Data Sheets*

Chapter 1830 requires each employer to develop or obtain an MSDS for each hazardous chemical the employer manufacturers, uses, or stores. § 1830.10(a). The information it shall contain is similar, though not identical, to the MSDS's prescribed by the Standard. *See* § 1830.10(b) and § 1910.1200(g)(2). There is no conflict between the two provisions, and the Akron MSDS's will not undercut the federal policy of worker safety.

Section 1830.10(b) requires that any employee, his or her designated representative, and the Health Commission are entitled to receive a copy of the MSDS's by the close of business on the next weekday after their requests. If an MSDS is not available from a supplier, a downstream employer may be exempted from this requirement by a renewed application to the supplier within ten days of a request. In contrast, the Standard mandates that an MSDS be made available to a requesting employee within fifteen days of his or her request. §§ 1910.1200(g)(10), 1910.20(e). Obviously, an employer can comply with both regulations by providing the requested MSDS's by the end of the business day following the employee's request. Plaintiffs argue that compliance with Akron's regulation may be impossible if large companies with many MSDS's are forced to gather them within twenty-four hours. Regardless of the correctness of that assessment, implied preemption occurs when compliance with a federal law is impossible when one attempts to also comply with a competing state or local law, not because compliance with the local law itself is im-

possible. Instead of asserting preemption, employers in a situation where they cannot physically comply with such a rule should argue that the ordinance does not satisfy minimal due process requirements, since the regulation as applied would have no "rational relationship" with Akron's objective. *See Williamson v. Lee Optical,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

### 7) *Employer Training Program and Employee Rights*

Section 1830.11(6) requires that employers subject to the ordinance create a training program to explain the hazards of the substances to which employees are exposed; the availability and function of labels, MSDS's and any other hazard communication devices; appropriate work practice; protective measures and emergency procedures. The components of the employee training program mandated by the Standard are substantially identical. Thus, there is no conflict which preempts the Akron provision.

Employers are also required to supply employees with a copy of § 1830.15, dealing with employee rights. § 1830.11(b). That provision guarantees an employee the opportunity to inspect information which the employer is required by Chapter 1830 to release; protects an employee from discrimination or discipline for exercising any rights under the Chapter, and permits the commencement of legal action if rights are violated; and allows an employee to request an inspection by the enforcement agents when the employee believes there is a violation of Chapter 1830 in the workplace. § 1830.15. There are no comparable requirements in the Standard, but the facilitation of the federal worker safety goal by these provisions is obvious.

### 8) *Enforcement of Chapter 1830*

Section 1830.12 establishes enforcement procedures for the Health Commission and the Health Department to implement, in-

nizing that furnishing workplace surveys to firefighter and other officials implicates a "broader purpose" than the Standard, but holding such a

requirement expressly preempted because New Jersey has distinguished between environmental and workplace surveys).

cluding random inspections, investigations prompted by employee complaints, and reporting duties to the Akron City Council. The Law Director is also given authority to institute legal actions involving the Akron ordinance. § 1830.13. Plaintiffs adduce no evidence that the enforcement of Chapter 1830 by these Akron officials would impede the enforcement efforts of federal regulators. Indeed, an additional set of enforcement agents may well deter violations of the Standard as well as of Chapter 1830.

### 9) *Protection of Trade Secrets*

Chapter 1830 contains a carefully drafted trade secret protection provision which exempts disclosure of the specific chemical identity of eligible substances, but which also permits otherwise protected information to be divulged to fire fighters, health professionals and exposed employees in certain situations. § 1830.14. Its trade secret provisions deviate from those of the Standard in several respects. First, the Standard does not share Chapter 1830's requirement that a chemical must be non-carcinogenic to be afforded trade secret protection. *See* 1830.14(a) and § 1910.-1200(i)(1). This difference cannot be preemptive, however, since the Third Circuit has held that the Standard cannot afford broader substantive trade secret protection than state law. *Auchter,* 763 F.2d at 741.

The Standard allows exceptions to trade secret protection only for treating physicians and nurses in emergency situations, and for various medical personnel treating employees in non-emergency situations and who follow enumerated procedural steps. §§ 1910.1200(i)(2) and (i)(3). Akron's ordinance permits access to trade secrets by both fire and medical personnel involved in an emergency where the information is needed for treatment or where the personnel will be exposed to hazardous chemicals, and to employees regularly exposed to the substance who execute confidentiality statements. Although the provisions of Chapter 1830 and the Standard which per-

mit different categories of persons to have access to trade secrets appear to be inconsistent, the Third Circuit has invalidated the Standard's limitations of access to trade secret information to health professions. *Auchter,* 763 F.2d at 743. Further, permitting medical and fire personnel who are exposed to hazardous chemicals in an emergency to learn the specific chemical identity of those substances implicates a community, rather than workplace, purpose. Since plaintiffs have not demonstrated how this access to information by endangered emergency personnel presents an obstacle to the federal purposes of the Hazard Communication Standard, such provision is not preempted.

Chapter 1830 also requires that Akron's Director of Health be automatically supplied by the employer with a copy of a written request for a specific chemical identity, a copy of the written denial furnished to the requesting person, and reasons for the decision, within thirty days of a denial if this information was requested by a regularly exposed employee, or if the denial was based upon a decision that a substance has trade secret protection. §§ 1830.14(c) and (k). The Standard permits a health professional denied trade secret access to initiate a review by OSHA. § 1910.-1200(i)(a). Neither the review of a denial by Akron's Health Director nor the mandatory nature of the review create a conflict with a review by OSHA. In addition, this additional reviewing procedure provided by the Akron ordinance supports the federal policy of denying access to trade secret information only where appropriate.

No other sections of § 1830.14 present preemption problems.

This Court cannot find, then, that any of the provisions of Chapter 1830 are impliedly preempted by the Standard. In fact, most of them supplement the Standard admirably. The Court now turns to plaintiffs' argument that Chapter 1830 violates the commerce clause.

### III.

■ Plaintiffs' second cause of action alleges that the duplicative and costly nature

of Akron's system for regulating hazardous chemicals communications constitutes an undue burden on interstate commerce. When presented with similar arguments, the court reviewing Pennsylvania's Right-to-Know statute responded:

> In *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 25 L.Ed.2d 174, 178, 90 S.Ct. 844, 847 (1970) the Supreme Court established the following criteria for determining whether a state statute violates the Commerce Clause:
>
>> Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Huron Cement Co. v. Detroit*, 362 US 440, 443, 4 L Ed2d 852, 856, 80 S Ct 813, 78 ALR2d 1294.
>
> We should also note that safety regulations are entitled to "a strong presumption of validity," *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 524, 3 L.Ed.2d 1003, 1007, 79 S.Ct. 962, 965 (1959). *Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662, 67 L.Ed.2d 580, 101 S.Ct. 1309 (1981).
>
> In the instant case, the Right to Know Act operates evenhandedly and thus the relevant inquiry is whether the burden on interstate commerce outweighs the local benefit. Plaintiffs have failed to demonstrate that the Right to Know Act will substantially burden interstate commerce. While we recognize that implementation of the Act may be costly and in that sense may burden interstate commerce, we cannot conclude that the burden outweighs the benefit. As a result we find that the Right to Know Act does not violate the Commerce Clause.

*Knepper*, at 1076. This Court is confronted with a similar evidentiary situation. Plaintiffs have proffered no evidence of the effect of Chapter 1830 on interstate commerce. Therefore, the extent of any impact upon interstate commerce is speculative, at best, while the benefits to Akron workers and the community are tangible and direct. Thus, this Court cannot find that the burden of Chapter 1830 upon interstate commerce is excessive in comparison to the local benefits. Since the regulation is "evenhanded," Chapter 1830 does not violate the commerce clause.

## IV.

This Court concludes that Chapter 1830 (Akron's "right-to-know" ordinance) is not preempted by federal law, nor does it violate the commerce clause of the federal Constitution. Plaintiffs' motion for a preliminary injunction is denied; judgment is entered for the defendants; defendants' motion to assess costs against plaintiffs is denied.

IT IS SO ORDERED.